Lakamoke, Judge,
delivered the opinion of the court:
This is an action by a trucking company to recover transportation charges for certain shipments of radar equipment based on the rate applicable to “Range or Height Finders” or “Scientific Instruments,” rather than the rate applicable to radio equipment.
The question presented is whether the radar equipment shipped should be classified, for transportation rate purposes, under the general heading of “Electrical Appliances or Equipment,” as “Radio Transmitting and Receiving Sets Combined,” which carried the first class rate, or under the general heading of “Drawing Instruments, Optical Goods or Scientific Instruments,” either as “Range or Height Finders,” or as “Scientific Instruments, N. O. I.,”[1] both of which carry double the first class rate.
Plaintiff, a Pennsylvania corporation, is the successor in interest to a partnership motor common carrier which carried the shipments involved in this case. These shipments were made by the War Department (now the Department of the Army) during the period March 20, 1945 to June 21,1945, from Lake Success, New York, to Baltimore, Maryland, and consisted of certain radar sets, designated “AN/TPL-1” by the Army, with parts, equipment and maintenance tools therefor.
A radar set is an electrical apparatus which operates by sending out radio (electromagnetic) waves. When these waves hit an object they are reflected (“bounce”) back to the set, whei'e, by a cathode ray tube, they appear as pictures (“blips”) on a receiving screen. Since the speed of the radio waves is constant and known, the distance of the object from the set can be measured by measuring the time lapse between the sending and the receiving of the radio waves, but since radio waves travel at a tremendous rate of *774 speed (186,000 miles per second) this measurement is only approximate.
Eadar Set AN/TPL-1 was a mobile, compact, lightweight radar unit designed for use with an anti-aircraft searchlight. Among its general functions was that of searching the sky for enemy aircraft, and, when found, to indicate their position by furnishing the slant range (distance in yards), and azimuth and elevation (angular directions in Mils). The set also computed the target altitude in feet. Its maximum slant range was 60,000 yards. The data so determined would be furnished to the operators of an anti-aircraft searchlight so that they could direct the beam of the searchlight when turned on to strike the target. The set could then be used to search for a second target while the searchlight followed the original target.
Plaintiff’s predecessor participated in a national trucking organization which published a tariff known as “National Motor Freight Classification No. 7, C. F. Jackson, Agent’s MF-I. C. C. No. 14,” and which contained ratings on all articles usually shipped over the lines of motor carriers in interstate commerce. The ratings here relevant are as follows :

The designations “1” and “Dl” mean that the first-class rate and double the first-class rate, respectively, are applicable to the items listed. These rates are translated into money by means of another tariff, issued by the Middle Atlantic States Motor Carrier Conference, Inc., in which plaintiff’s predecessor also participated, and known as “Exceptions to National Motor Freight Classification No. 7, East, Freight Tariff No. 10-D, MF-I. C. C. No. 6.” This tariff gave the first-class rate as so many cents per 100 pounds of the article shipped, and double the first-class rate as twice as *775 much. The first-class rate applicable during the period here involved for shipments from Lake Success, New York, to Baltimore, Maryland, was' $1.09 for 100 pounds prior to May 14,1945, and $1.115 per 100 pounds thereafter, and double the first-class rate was $2.18 per 100 pounds prior to May 14, 1945, and $2.25 per 100 pounds thereafter.
The shipments here involved were described in the bills of lading as “Badio Beceiving and Transmitting Sets,” “Second Echelon Spares,” and “Badio Beceiving and Transmitting Sets and Second Echelon Parts.” Plaintiff’s predecessor first considered this equipment to be classifiable, under the general heading “Drawing Instruments, Optical Goods, or Scientific Instruments,” as “Scientific Instruments, N. O. I.” This classification carries double the first-class rate and plaintiff collected charges accordingly. The General Accounting Office ruled that it should be classified, under the general heading “Electrical Appliances or Equipment or Parts Named,” as “Badio Transmitting and Beceiving Sets, Combined,” which carries the first-class rate. The difference between the charges collected and those which the General Accounting Office deemed applicable, were deducted from moneys due plaintiff for other transportation.
The total charges received by plaintiff, after deductions by defendant, were $2,847.44. The charges which would have accrued at double the first-class rate are $5,833.78, so that if double the first-class rate is found to be applicable, defendant will be liable to pay the additional amount of $2,986.34.
The applicable ratings for radar equipment, such as was shipped by defendant, were for a long time a subject of discussion between the Department of the Army, the General Accounting Office, and the National Classification Board of the American Trucking Association, Inc. That Board determined applicable ratings on behalf of the motor carriers. On May 20, 1947, the Board attended a demonstration of radar installations conducted by the War Department during which the working parts were shown and the principles involved explained. Some nine months after this demonstration the Board came to the conclusion, in agreement with the General Accounting Office and the bill of lading descriptions, that the equipment should be classi *776 fied as “Radio Sending and Receiving Sets, Combined.” However, about two weeks after this decision, Mr. Tingling, a member of the Board, and plaintiff’s chief witness, wrote to the Freight Branch, Department of the Army, sending copies to the General Accounting Office, to plaintiffs, and to the Weighing & Research Bureau of the American Trucking Association, Inc., stating that the equipment in question was a range and height finder and that double the first-class rate was, therefore, applicable to such shipments. This change of opinion was not based on any further investigation of the actual equipment or of its transportation characteristics, but was based solely on certain definitions and explanations contained in War Department Technical Manuals.
The matter was then further considered by the Board until September 18, 1953, at which time the Board again came to the conclusion that the original classification, “Radio Transmitting and Receiving Sets, Combined,” was the proper one. The Board said:
Recently the full membership of the Board arranged to inspect a very complete Radar installation at one of the nearby Airforce Bases for the purpose of learning at first hand how the equipment is used and of what it consists. We learned that, basically, Radar is a type of radio * * *.
After considering the facts observed and learned, the Board has concluded that Radar receiving equipment should be rated as Radio Receiving Sets. * * *.
It is noted at the outset that the question in this case is one of fact, i. e., under which classification heading of the tariff do radar sets AN/TPL-1 fall. Plaintiff has the burden to show (1) that the classification of this equipment as “Radio Sending and Receiving Sets” under “Electrical Appliances and Equipment” made by the National Classification Board of the American Trucking Association, is wrong and (2) that its classification as either “Range or Height Finders” or “Scientific Instruments, N. O. I.,” both appearing under “Drawing Instruments, Optical Goods or Scientific Instruments” is correct.
We believe the plaintiff has failed to meet the burden of proof on both issues. First plaintiff has failed to show that radar should not be classified as radio equipment.
*777 Plaintiff relies upon purported distinctions between radar and radio equipment which the evidence does not sustain. Radar operates on familiar radio principles. Its basic working parts are essentially electronic equipment such as is found in radio and television sets, each of which take the first class rate. National Motor Freight Classification No. 7, C. F. Jackson, Agent MF-I. C. C., No. 14; p. 121 of Exceptions to National Motor Freight Classification No. 7.
The Interstate Commerce Commission has consistently held that the true test for classification purposes is the character of the article shipped. See Northern Pump Co. v. Chicago M. St. P. & P. R. R. Co., 190 I. C. C. 421, 422; Markstein v. Missouri Pac. R. Co., 243 I. C. C.. 345, 348; Linen Thread Co., Inc. v. Pope & Talbot, Inc., 256 I. C. C. 79, 81; Chemi Products Co. v. Springmeier Shipping Co., 266 I. C. C. 263, 265.
In all bills of lading prepared by Army personnel, these shipments were described as radio equipment. There is no evidence that the shipments were deliberately described incorrectly and the equipment having been manufactured by the Army according to Army specifications, it would seem that the Army was best qualified to describe the characteristics of it. As was said in Northern Pump Co. v. Chicago M. St. P. & P. R. R. Co., supra, “we have in numerous cases accepted a manufacturer’s description of a commodity for sales purposes as determinative of its identity for transportation purposes.”
Moreover, and very important to the determination of this issue, the National Classification Board of the American Trucking Association, after twice fully considering the question of proper classification of radar, came to the conclusion that radar should be rated as radio equipment. This Board is a body set up by the trucking industry specifically for the purpose of creating and interpreting classification schedules, and acts as the representative of the carriers.
Even were the two descriptions and tariffs equally appropriate, the shipper is entitled to have applied the one specifying the lower rates. United States v. Gulf Refining Co., 268 U. S. 542, 546.
*778 Secondly, plaintiff has failed to show that radar should be classified either as “Range or Height Finders” or as “Scientific Instruments.”
Plaintiff’s first contention in this respect is that radar should be considered as “Range or Height Finders.” The evidence shows, as found by the commissioner of this court, that a “range finder” is an optical instrument for finding the distance to a target.
The heading “Drawing Instruments, Optical Goods or Scientific Instruments” and the items listed thereunder, “Range or Height Finders” and “Scientific Instruments, N. O. I.,” shows that those terms as they are used clearly indicate delicate and precise optical instruments. The radar equipment in this case was used merely to detect the presence of an object which may not be visible. Range or height finders are used to give the location of the object and necessarily would encompass delicate and precise optical instruments as well as scientific instruments to find the exact location of objects such as aircraft. The evidence shows that radar is only accurate within 500 yards and the users need not have scientific training. It must be further noted that the evidence shows without contradiction that this radar equipment was not a delicate precision instrument — that it is a field Army type of equipment that has to be transported on its own wheels across country and bumped along like a jeep and contains the same basic electronic components as a piece of field radio equipment.
Plaintiff points to several dictionary and encyclopedia definitions as well as the Army technical manuals upon which it bases its contention that this radar equipment is a range and height finder. However, the question here is not what is the best definition of “Range or Height Finders” but whether this radar equipment fits within the meaning of that term as used for rate fixing purposes in the transportation schedule.
The article as a whole must be looked to and the nature of the article must be looked to rather than its use in determining classification. Anthony v. Director General, 61 I. C. C. 366, 368; Simon v. Southern Railway, 102 I. C. C. 326; Union Smelting & Refining Co. v. Pennsylvania Railroad Co., 152 *779 I. C. C. 434, 436; Lynchburg Iron & Metal Co. v. Seaboard Air Line Railway, 160 I. C. C. 241, 242; Val Blatz Brewing Co. v. Atchison T. & S. F. Railway, 173 I. C. C. 488, 490; Lansing Dairy Co. v. Wabash Railway, 185 I. C. C. 599, 600; Darling & Co. v. New York. C. & St. L. R. Co., 213 I. C. C. 418, 422.
Therefore, it must be concluded that considering the underlying transportation characteristics involved, these radar sets are electronic equipment very similar to radio in principle and in their essential parts, and the classification made by the National Classification Board is proper. The first class rate applicable to radio is the proper charge to be made on these shipments.
Plaintiff’s petition is dismissed.
Madden, Judge; Whitakee, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wiliam E. Day, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Pennsylvania and is a motor common carrier of property, operating pursuant to authority issued by the Interstate Commerce Commission. Its operations include the transportation of property from Lake Success, N. Y., to Baltimore, Md. It is successor in interest to a partnership composed of A. L. Buch, Raymond Buch and Sondell Coleman, doing business as Buch Express, which was a motor common carrier of property from Lake Success to Baltimore, from a time prior to January 1, 1945 to January 1,1947.
2. Plaintiff’s predecessor during the period March 20,1945, to and including June 21,1945, was tendered for transportation, and did transport for the War Department of the United States, 20 shipments of property from Lake Success, N. Y., to Baltimore, Md. Such property was described on the bills of lading as “Radio Receiving and Transmitting Sets, Combined,” “Radio Receiving and Transmitting Sets,” *780 “Second Echelon Spares,” and “Radio Receiving and Transmitting Sets and Second Echelon Parts.”
3. Plaintiff’s predecessor collected charges for such transportation based on rates which it believed to be applicable on Scientific Instruments, N. O. I. The General Accounting Office subsequently ruled that the proper charges were those applicable on Radio Transmitting and Receiving Sets, Combined, which charges were substantially less than those collected ; and the difference between charges collected and those which the General Accounting Office deemed applicable were deducted from monies due plaintiff for other transportation.
4. The shipments consisted of Radar Set AN/TPL-1, parts therefor, and equipment and tools used in the operation and maintenance thereof.
5. There was no rate applicable specifically on radar sets or parts and equipment for radar sets transported from Lake Success to Baltimore, and it was necessary to refer to the so-called classification tariffs to determine the rate applicable on the shipments.
6. Plaintiff’s predecessor participated in National Motor Freight Classification No. 7, C. F. Jackson, Agent’s MFI. C. C. No. 14, which was in effect when the shipments moved and which contained ratings on all articles usually shipped over the lines of motor carriers in interstate commerce. This tariff contained no item which specifially named radar equipment. It was necessary to determine whether radar sets, parts and equipment came within any generic description set forth in the tariff. Rule 13 of the tariff reads as follows:
A shipment, definition.
Sec. 1. A shipment is a lot of freight received from one shipper, at one point at one time for one consignee at one destination and covered by one bill of lading.
LTL, AG, or Vol. ratings.
Sec. 2. (a) A “Volume” rating is a rating in connection with which “Vol., min. wt.” is provided.
(b) A “Less Than Truckload” (LTL) rating is a rating other than a “Volume” rating applying on an article for which a “Volume” rating is provided herein.
*781 (c) An “Any Quantity” (AQ) rating is a rating applying on an article for which no “Volume” rating is provided herein.
(d) The “Less Than Truckload” ratings cover shipments in quantities less than the minimum weight specified for volume shipments, subject to Section 5 of this rule. An any quantity rating will apply regardless of the weight of the shipment.
Volume shipment.
Sec. 3. (a) Volume ratings or rates apply only when a volume of freight is shipped from one point (or places within plant of one shipper) in one day by one shipper, “on one bill of lading,” for delivery to one consignee at one destination. When a Volume Eating is used charges will be assessed at the volume minimum weight shown herein, except that actual weight will apply when in excess of the volume minimum weight.
Mixed Volume or mixed truckload shipment.
(b) Unless otherwise provided, when a number of different articles, for which volume or truckload ratings or rates are provided when in straight volume or truckload shipments, are shipped at one time by one consignor to one consignee and destination, on one bill of lading as a mixed volume or a mixed truckload shipment, the entire shipment will be charged at the highest straight volume or truckload rate and subject to the highest straight volume or truckload minimum weight that would be applicable to any article in the shipment if that quantity of each article in the mixed shipment were tendered as a straight volume or straight truckload shipment; however, when the aggregate charge upon the entire shipment is less on basis of volume rate and volume minimum weight (or actual or authorized estimated weight if in excess of the volume or truckload minimum weight) for one or moi’e of the articles and on the basis of less than truckload or any quantity rate or rates on the *782 actual or authorized estimated weight of the other article or articles, the shipment will be charged for accordingly.
Dividing Volume shipments.
Sec. 4. Subject to the provisions of Section 3 (b), when the aggregate charge upon the entire shipment is made lower by considering the articles as if they were divided into two or more separate shipments subject to other than LTL or A.Q ratings, the shipment will be charged for accordingly.
LTL not exceed Vol. charge.
Sec. 5. The charge for a shipment moving under Less than Truck Load ratings shall not exceed the charge applicable to the same shipment under the Volume Eatings at the volume minimum weight specified.
Bule 14 of the tariff reads as follows:
Articles not specifically provided for.
Sec. 1. The rating for any article not provided for, either by its specific name or embraced in an N. O. I. item, shall be the rating provided in this classification or supplements thereto for an article which, in the carrier’s judgment, is the most closely analogous. In such cases, facts must be reported to proper officer in order that the rating applied may be verified and establishment of specific provisions considered. This rule will not apply in connection with ratings or rates published in exceptions to this classification or in commodity tariffs.
Iron versus Steel.
Sec. 2. Unless otherwise specifically provided, wherever the term “iron” is used herein, it also includes “steel,” and vice versa.
Eubber.
Sec. 3. Unless the contrary appears, the word “rubber” wherever used m the classification includes artificial, guay-ule, natural, neoprene or synthetic rubber.
Gauge of Metal.
Sec. 4. Unless otherwise provided, where reference is made to the gauge of metal, it means U. S. Standard Gauge.
The following items appear on page 98 of the tariff:

*783
Item Articles Ratings

DRAWING INSTRUMENTS, OPTICAL GOODS OE SCIENTIFIC instruments — Continued:
17 Range or Height Finders, with or without stands, in boxes or crates Dl
Vol., min. wt. 15,000 lbs. 1
21 Scientific Instruments, N. O. L, in barrels or boxes Dl Vol., min. wt. 10,000 lbs. 1
Page 103 of the tariff contains the following item:

Item Articles Ratings

Electrical appliances oe equipment or parts named — Con.
38 Radio Transmitting and Receiving Sets combined, in boxes or crates 1
Vol., min. wt. 18,000 lbs. 3
The designation “Dl” means double first class, and the designation “1” means first class. Shipments of articles rated first class were charged the first-class rate published in rate tariffs participated in by the carrier and articles rated double first class were charged at two times the first-class rate. The rates were stated in cents per 100 pounds and were published in tariffs issued by the Middle Atlantic States Motor Carrier Conference, Inc., and participated in by plaintiff’s predecessor.
7. During the period the shipments moved, plaintiff’s predecessor participated in a tariff issued by the Middle Atlantic States Motor Carrier Conference, Inc., designated as “Exceptions to National Motor Freight Classification No. 7, East, Freight Tariff No. 10-D, MF-I. C. C. No. 6.” This tariff contains exceptions to the National Motor Freight Classification and the provisions take precedence over those in the classification. There appears on page 52 of this tariff the following rule:
Bule 3 Application op classification volume Ratings
(a) In the absence of Commodity Bates or Exceptions in Section 1 hereof (Bule 1), and except as otherwise provided in paragraph (b), the volume ratings provided for in the National Motor Freight Classification will apply on truckload shipments subject to truckload minimum weights as provided in Buie 4 (b).
(b)_ Articles rated in the National Motor Freight Classification higher than Class 1 (or 100) L. T. L. will, in the absence of exceptions in Section 1 hereof, be subject to such L. T. L. ratings in any quantity, and the Volume Batings will not be applicable.
(Files B-510; S-1476)

*784

*785 Item 5160 quoted above was canceled by Item 5160A in Supplement No. 28 to the tariff, effective October 20, 1945. The amended item which was effective after these shipments moved made no material change in the provisions thereof.
8. The first-class rate applicable during the period the shipments moved from Lake Success, N. Y., to Baltimore, Md., was $1.09 per 100 pounds prior to May 14,1945, and $1,115 thereafter. The double first-class rate was $2.18 per 100 pounds prior to May 14,1945, and $2.23 thereafter.
9. War Department Technical Manual, TM11-1352, issued by the War Department on the 22d of November 1944, contains a general description, operating instructions and equipment performance log for Badar Set AN/TPL-1. The following appears on page 1 of the publication:
1. Purpose.
_ Badar Set AN/TPL-1 (fig. 2) is a mobile, compact, lightweight radar unit designed for use with an antiaircraft searchlight. In all conditions of normal operation the unit will be carefully sited and accurately oriented. If desired, however, the unit may be used to give indications of approaching aircraft when the equipment is being transported in convoy. The general functions of the equipment are as follows:
a. To search the sky for enemy aircraft and, when found, to indicate their position. Position data is furnished as slant range (distance in yards) and as azimuth and elevation (angular directions in mils). The radar set also computes target altitude in feet. The altitude may be measured with either the radar set or sea level as the reference. The maximum slant range of the equipment is 60,000 yards.
b. To furnish target-position data to an antiaircraft searchlight so that the beam of the searchlight, when it is turned on, will strike the target.
c. To search for a second tai'get while the searchlight follows the original target.
# # }■< # *
3. BANGE DETERMINATION.
In Badar Set AN/TPL-1, as in other radar units, the slant range to a target is determined by converting time into distance. The time involved is that required for a radio signal (main pulse) to leave the transmitting antenna, travel to the target, be reflected from the target, and return (as an echo) to the receiving equipment. The changeover from time to distance is possible be *786 cause the velocity of radio waves is constant and has been measured. Actual calculations of slant range by radar operators are made by having a picture of the main pulse and of the target echo appear on the calibrated screen of a cathode-ray tube. The echo of the main pulse appears at a point along the scale which corresponds to the slant range of the target (fig. 7).
The following appears on pages 5 and 6 of the publication:
(4) Raxge markers. As previously mentioned, the range of a target is represented by the distance from the center of the scope screen to the target echo. In Radar Set AN/TPL-1, this distance (range) can be gauged by means of a series of concentric circles of bright light on the PPI scope (fig. 12) known as “range markers”. These circles of light, the centers of which are at the center of the screen (zero range), have a 10,-000-yard radial distance established between them. By closing a switch, the operator allows either three or six range-marker circles to appear on the scope screen, and then determines the approximate range of the echo by noting its position with relation to the concentric markers. Thus, the bright spot located midway between the fifth and sixth rings would represent a target at a range of 55,000 yards. The position of the target echo can also be read with relation to the rectangular coordinates on the transparent disks.
The component parts of the set when ready for use are assembled on a cabinet or mounted on such cabinet. The cabinet is mounted on four wheels with pneumatic tires which are removed when the set is in an operating position. The set is mounted on wheels only for the purpose of rolling the set out and into the transporting trailer, and the manual states at page 7:
* * * The cabinet is not spring supported upon the wheels and therefore, must NOT be towed on its own wheels by another vehicle.
The major components of Radar Set AN/TPL-1 are an antenna assembly, a pedestal, a receiver, a synchronizer, a modulator, a pulse transformer, a tracking indicator, a main drive, a 24-volt power supply, a cabinet (includes crystal mixer, magnetron, and T/R box), a high-voltage power supply, a range indicator unit (contains PPI scope and range *787 scope), a preamplifier, a ventilation assembly, a special test set, a tent, a power cable and a data cable.
10. The shipments were loaded at the place of origin in van-type trailers and on the door of each trailer a seal was placed which remained unbroken until the shipment was received at Baltimore. Some secrecy as to the true identity of shipments was required for reasons of security. The radar set was not assembled when shipped. The set and articles to be used in its operation were shipped in 14 boxes. The contents of each box are described in War Department Bulletin SB 11-05. One box contained a transmission, a flexible drive coupling and a console cabinet; one box contained an antenna assembly, an antenna base guard and a pedestal; one box contained an antenna reflector and a paraboloid assembly; two boxes each contained a wheel assembly; two boxes each contained a cord and a power cable reel; one box contained a label set, three operator’s chairs, a maintenance equipment case, three chest sets, three headsets, three metallic visors, six instruction books and three telephones; one box contained a maintenance equipment case, two covers and a tent; one box contained tent poles, stakes and a.hammer; one box contained a maintenance equipment case, a heater and maintenance equipment; one box contained a power unit; one box contained spare parts and another box contained two electron tubes. The shipments described as second echelon parts were shipped in 15 separate packages, 8 of which were standard carrying chests and 7 of which were manufacturers’ packing cases. The packages contained various parts for the set such as vacuum tubes, lamps, capacitors, resistors, sockets, terminals, coils, circuit breakers, switches, transformers, and antenna assembly.
11. A range finder is an optical instrument for finding the distance to a target. The user, looking into the eyepiece, sees a field of view composed of two images, one erect and one inverted. Coincidence is obtained by bringing two images into coincidence with each other. The range of the target is then indicated on a range scale.
All range finders employ the principle of triangulation for measuring distance. Each range finder is composed of two telescope objective systems placed horizontally and sharing *788 a common eyepiece. Bays of light from the target enter the range finder through two windows located at the ends of the range finder. The distance between the centers of these windows forms the base of a triangle whose apex is at the target. One angle of the triangle, at the end of the base line, depends on the distance to the target. The distance between the target and the range finder corresponding to this angle is read on the range scale.
12. The applicable ratings for radar equipment such as was shipped by the defendant were for a long time a subject of discussion between the Department of the Army, the General Accounting Office, and the National Classification Board of the American Trucking Association, Inc. That Board determined applicable ratings on behalf of motor carriers.
Under date of March 9,1948, the Secretary of the National Classification Board advised the Weighing and Besearch Bureau of the American Trucking Association, Inc., that the applicable rate for radar equipment shipped in plaintiff’s trucks was properly that used for radio sending and receiving sets combined. Thereafter, on March 23, 1948, a member of the National Classification Board wrote to the Freight Branch, Department of the Army, sending copies to the General Accounting Office, to plaintiffs, and to the Weighing and Besearch Bureau, stating that the equipment in question was a range and height finder, and that double the first-class rating was applicable to such shipments. The matter continued to be considered by the National Classification Board, which, on September 18, 1953, made a decision, pursuant to which the following advice was sent to the Weighing and Inspection Bureaus of the American Trucking Association, Inc., finally deciding that the applicable rate was not greater than that for radio sending and receiving sets combined:
Re: “Radar” or “Radar Equipment”
Under outstanding rulings of this Board, “Radar” and “Radar Equipment” has been held to be ratable as Bange or Height Finders, per item 32700 of the Classifications.
For the past several years the Board’s opinion has been objected to by various Government agencies and commercial manufacturers and shippers. We are aware of the fact that the General Accounting Office has been *789 cutting the carriers’ charges back to the ratings provided for Radio Transmitting and Receiving Sets Combined.
At least two Motor Carrier Rate Conferences have issued bulletins to their members indicating their disagreement with the Board’s ruling, and have recognized the applicability of the ratings for Radio Transmitting and Receiving Sets Combined.
Recently the full membership of the Board arranged to inspect a very complete Radar installation at one of the nearby Airforce Bases for the purpose of learning at first hand how the equipment is used and of what it consists. We learned that, basically. Radar is a type of radio which by means of certain equipment transmits electric impulses or signals; on hitting an object in their path they bounce back or return to the point of origin where they are received by other type of equipment as sound signals, but such signals are transmuted into visual signals by means of cathode ray and other electronic tubes. The transmitting equipment can be, under some circumstances, combined with the receiving apparatus; on the other hand the transmitting and receiving components are shipped independently of each other.
Beyond functioning as just described, the signals received, whether sound or visual, may, by the use of devices or equipment other than the basic transmitting or receiving equipment, be evaluated in various terms or be put to use in connection with computing or controlling apparatus, such as is used with guns of various types. We were advised that depending on the type or character, or size, or conditions at the point of installation, a particular shipment may or may not include various power supplying apparatus such as motors or generators, and may or may not include antennas.
After considering the facts observed and learned, the Board has concluded that Radar receiving equipment should be rated as Radio Receiving Sets. Radar transmitting equipment shipped prior to November 13, 1952 should be rated as Electrical Appliances or Instruments, NOI; and on and after such date should be rated as Radio Transmitting Sets, item 34860 as amended. The Board did not see any transmitting or receiving equipment that was of such a nature as to be considered as being “combined” nor has the Board ever been furnished with any specific information as to such equipment, in light of which we do not express any opinion as to any equipment being considered ratable'as Radio Transmitting and Receiving Sets combined, item 34860.
*790 Such power supply units, antennas, or devices for computing, or for controlling other apparatus, when shipped by itself, that is not with the transmitting and receiving equipment, will be subject to such descriptions and ratings as may be determined to be applicable according to its character.
Any outstanding advices contrary to the foregoing, and particularly Ruling 535 shown in the Board’s list of principle rulings, are hereby canceled.
13. The total charges received by plaintiff after deductions by defendant were $2,847.44. The charges which would have accrued at the double first-class rates are $5,833.78, and if the double first-class rates had been found to be applicable, plaintiff would have been entitled to the sum of $2,986.34.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is not entitled to recover, and the petition is therefore dismissed.

 Not otherwise indexed.