**UNITED STATES of America,**
Defendant, Appellant,

v.

**The NEW YORK, NEW HAVEN AND
HARTFORD RAILROAD COM-
PANY, Plaintiff, Appellee.**

No. 5090.

United States Court of Appeals
First Circuit.

Aug. 10, 1956.

Edmund M. Sweeney, Boston, Mass., for appellee.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

This is an appeal from a summary judgment in favor of the New York, New Haven and Hartford Railroad Company against the United States in the sum of $402.84. Though the amount involved is small, this is a test case, determination of which will settle the government's liability in a number of similar suits.

In 1953 plaintiff Railroad filed its complaint in the district court against the United States under the Tucker Act, 28 U.S.C.A. § 1346, demanding judgment in the amount of $1,143.03 as payment for transportation of a certain shipment of goods in 1950. A substitute answer filed by the United States admitted liability for the amount demanded under the 1950 shipment, but pleaded payment in full, by a check for $117.77 in 1951 and by credits of $1,-025.26 on account of overpayments previously made in the settlement by the United States of four bills submitted by the plaintiff for transportation of goods in 1944—said credits being alleged to have been taken pursuant to § 322 of the Transportation Act of 1940, 54 Stat. 955, 49 U.S.C.A. § 66. The answer contained this further allegation:

"The said overpayments represent for the most part the difference between charges resulting from the use for computation purposes of carload minimum weights based on the size of car furnished and used, and the charges resulting from the use for computation purposes of carload minimum weights based on the size of car orderd by defendant and adequate for the shipment. Plaintiff at no time prior to, or subsequent to, the time of the filing of this suit furnished the defendant with facts with respect to its failure

Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., with whom Warren E. Burger, Asst. Atty. Gen., Anthony Julian, U. S. Atty., Boston, Mass., and Melvin Richter, Atty., Dept. of Justice, Washington, D. C., were on brief, for appellant.

to provide defendant with the car ordered."

To this pleading the plaintiff filed an "answer" or reply, admitting the receipt of the check in the amount of $117.77 but denying that it had overcharged the United States with respect to the four shipments in 1944; "and the plaintiff further says that the defendant's determination of overpayment was arbitrary and capricious in that Service Order No. 68 as issued by the Interstate Commerce Commission on 30 January 1942 was in full force and effect and applicable thereto; and the plaintiff further says that it fulfilled its every obligation with respect to providing the defendant with any facts pertaining to such transportation."

It appears that with respect to the several shipments of naval property in 1944 the initial carrier had furnished on each occasion a freight car of greater length than that ordered in the bill of lading, and that the plaintiff, as the terminal carrier (*not* the railroad which furnished the cars) had collected from the government at the higher rates applicable to the size of car furnished rather than at the lower rates applicable to the smaller freight cars ordered.

There had been a long-standing unwritten rule that a carrier held itself out as being able to furnish the cars listed in its tariff, and so could not charge more when it furnished cars larger than those ordered. This rule was carried into § 6(a) of Rule 34 of the rules of the ICC:

> "If carrier is *unable* to furnish open car of length ordered, and furnishes longer car, minimum weight shall be that fixed for car *furnished, except* that if articles are of such length as could have been loaded on car of length ordered, minimum weight shall be that fixed for car *ordered.*" [Italics added.]

Under the foregoing rule it followed that, even if the carrier had been unable to supply the size of car ordered, it had to charge only for that size (pro-

vided, of course, that such a smaller car would have been big enough to carry the articles shipped). And if the railroad *was* able to furnish the car size ordered, but for its own convenience, or by error, it supplied a larger car (which would be an *a fortiori* case), § 6(a) of Rule 34 by its terms might not apply, but the earlier general unwritten rule required the railroad to make only the charge applicable to the smaller size of car ordered. In 1942, as a wartime measure to force shippers to make a fuller loading of cars, and thus to contribute to their more economical use, the ICC issued Service Order No. 68, above referred to, which, *inter alia,* suspended the provision of § 6(a) of Rule 34 that had limited charges in the case of the substitution of a larger car to the amount chargeable for the smaller size car ordered. Thus, at the time in question here (1944), if the railroad was unable to furnish the size of car ordered, the railroad properly could bill the shipper for the size of car actually supplied. However, it was determined, and we think correctly, in Atlantic Coast Line R. Co. v. United States, 1953, 112 F.Supp. 594, 125 Ct. Cl. 235, that where the carrier *was* able to furnish a car of the size ordered, but supplied a larger car, the proper billing was at the rate applicable to the car ordered. This was so because Service Order No. 68 purported only to suspend § 6(a) of Rule 34, whose terms referred to the situation of a carrier who was *unable* to furnish what was ordered; in the case of a carrier who was able, but did not, furnish the size of car ordered, the old case law rule still governed.

Thus it will be seen that for the year now in question the availability to the carrier of certain sizes of cars became the controlling question of fact in determining the validity of the charges on bills of lading in which the shipper had specified the use of a freight car of a certain size.

In the district court the plaintiff addressed a long list of interrogatories to the defendant, some of which were an-

swered and some objected to. At a hearing on the defendant's objections, the district court ruled that the plaintiff need allege nothing beyond the facts of the particular 1950 shipment set forth in the complaint, the bill for which transportation the United States had refused to pay. The court's ruling is indicated by the following two paragraphs dictated by the judge at the conclusion of the hearing:

"The defendant contends that the plaintiff is not entitled to recover anything unless it shows that the government has not made overpayments on prior transportation contracts and designated bills which are referred to in defendant's answer.

"I rule as a matter of law that it is not the burden of the plaintiff to set forth in this complaint anything with respect to those prior transportation contracts; and it is not the burden of the plaintiff to make any showing that on an overall basis the government has not overpaid the plaintiff. This is a suit upon a particular contract of transportation. Other contracts claimed by way of setoff or otherwise must be set up in the defendant's answer and proved by the defendant."

Thereafter, the Railroad filed a motion for summary judgment, with an affidavit attached to the motion indicating that through administrative negotiations it had accepted in part the credits asserted by the General Accounting Office, reducing its demand for judgment to the sum of $402.84. The United States moved for judgment in its favor on the ground that the Railroad had "failed to plead facts entitling it to recover herein." On November 23, 1955, the district court gave judgment for the Railroad in the amount of its reduced demand, at the same time denying defendant's motion for judgment. From this judgment the United States has taken the present appeal.

█ It seems to us that unless the Congress has definitely prescribed other-

wise, the position of the United States as shipper, so far as the present case is concerned, is no different from that of a private shipper.

█ If a private shipper or consignee should pay the carrier before satisfying himself of the correctness of the charges demanded—as he may be required to do pursuant to § 3(2) of the Interstate Commerce Act, 49 U.S. C.A. § 3(2) and regulations of the Commission thereunder—and later sues for a refund of alleged overpayments, or seeks to set off the amount of the overpayments against another claim admittedly due, in either case the shipper or consignee would have the burden of alleging and proving the fact and the amount of such overpayment.

█ On the other hand, if the private shipper or consignee should hold up payment of a shipping charge pending an audit to determine its correctness, and is thereupon sued by the carrier for the amount of the charge, of course the carrier would have the burden of alleging and proving the amount due.

Prior to 1940, the government, as shipper, followed the second of the foregoing courses. Payment by the government of transportation bills was accomplished in the same manner as for all other contracts. That is, an officer of the department concerned had to certify to a disbursing officer of his department that the bill was valid in all respects (service rendered, charges at lawful rate, computations correct, expenditure authorized by law, etc.), whereupon it would be paid. A bill that was doubtful in the eyes of the certifying officer would be forwarded to the General Accounting Office for its determination in advance of payment. See 1922, 33 Ops.Atty.Gen. 383. As a practical matter, it may be that the carriers were thus required to extend credit to the United States on account of shipping charges, though it seems that, under § 3(2) of the Act, the carriers were not required by law to relinquish possession of the shipment at destination prior to payment.

In § 322 of the omnibus Transportation Act of 1940, 54 Stat. 955, the Congress enacted as follows:

> "Payment for transportation of the United States mail and of persons or property for or on behalf of the United States by any common carrier * * * shall be made upon presentation of bills therefor, prior to audit or settlement by the General Accounting Office, but the right is hereby reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier."

The legislative history of § 322 furnishes no further light upon what the Congress may have had in mind with respect to the question before us, except that the inference is pretty clear that the section was remedial legislation passed at the behest of the carriers, who had complained of the inordinate delays of the pre-audit procedure theretofore prevailing which resulted in tying up large amounts of accounts receivable. See Hearings Before the House Interstate and Foreign Commerce Committee on H.R. 10620, 75th Cong., 3d Sess. 35 (1938).

The United States urges us to read the last clause of § 322 as providing in effect that when an accounting officer, upon post-audit of a transportation charge, determines that a certain portion of the amount paid was an overcharge, he may direct the amount of such alleged overcharge to be set off against an amount subsequently found to be due to the carrier on another transaction; and that, when this is done, in order to recover the amount admittedly due on the subsequent transaction, the carrier must have the burden of alleging and establishing that there was no overpayment in the prior transactions used by the government by way of setoff.

■ We find no language in § 322 justifying this extraordinary result.

All that § 322 does is to authorize and direct disbursing officers of the United States to pay transportation bills upon presentation, without waiting for audit or settlement by the General Accounting Office. This the United States might choose to do, just as a private shipper might pay the bills rendered by a carrier without making an audit.

■ Section 322 concludes with the words, "but the right is hereby reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier." We suppose that this provision was inserted out of an abundance of caution, because the availability of a setoff by the United States need not depend upon specific statutory authorization. "It is but the exercise of the common right, which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him." Gratiot v. United States, 1841, 15 Pet. 336, 370, 10 L.Ed. 759. See Wisconsin Central R. Co. v. United States, 1896, 164 U.S. 190, 206–210, 17 S.Ct. 45, 41 L.Ed. 399. The quoted language of § 322 reserves the right to the United States to offset "the amount of any overpayment". This means that, before the claimed setoff must be accepted in a judicial proceeding, the existence of such overpayment must be objectively determined, in fact and in law; it is not enough merely that some accounting officer has unilaterally asserted the existence of such overpayment. In the case at bar, the General Accounting Office has not even determined that there had been such overpayments; it claimed a "credit" for the difference between the amounts properly chargeable for the use of the freight cars actually supplied by the initial carrier and the amounts properly chargeable for the freight cars of the sizes requested in the bills of lading. But as we have seen above, the difference between these two amounts was not necessarily an overcharge in 1944. Whether it was an

overcharge or not depended upon the establishment of an extrinsic fact, namely, at the time and place, was the initial carrier able to supply freight cars of the smaller sizes ordered? But in answer to one of plaintiff's interrogatories, the defendant stated that it was "without knowledge of whether a car of the size in feet ordered by defendant was available to plaintiff and/or the initial carrier." In other words, the government's so-called post-audit did not undertake to determine the important extrinsic fact necessary to be established in order to sustain the claimed setoff.

In summary, we are in agreement with the very recent statement of the Court of Claims, in Atlantic Coast Line R. Co. v. United States, 1956, 140 F.Supp. 569, 572, that, "Since the Government is seeking to set off, against an admittedly valid claim, a claim which it asserts arises out of another transaction, it has the burden of persuading us as to the validity of its offset."

Though there is nothing in the terms of § 322 that lends support to the government's position, it would be well, perhaps, to mention another possibility, which has no relation to § 322. It might be that, though the United States has the ultimate burden of proof to establish overcharges in the 1944 transactions which it used as a setoff or "credit" in the present case, yet proof by the United States that the carrier had furnished and charged for cars of larger size than ordered by the bills of lading could be regarded as making out a prima facie case to establish the validity of the claimed credits, entitling the United States to the benefit of a rebuttable presumption that the carrier had available, and could have supplied, cars of the lesser size ordered, and thus was guilty of overcharges. If this were so, then the burden would have been upon the carrier to go forward with evidence tending to rebut the presumption, failing which the validity of the setoff or credit would have been established.

Of course, rules as to burden of proof, rebuttable presumptions, burden of going forward with the evidence, etc., are established as matters of fairness, and convenience or availability of proof.

In the present case, if the statistical chances pointed strongly to the likelihood that carriers, merely for their own convenience, frequently substituted larger cars for the smaller sizes ordered, it might be reasonable to have a rebuttable presumption to that effect. We gather from Atlantic Coast Line R. Co. v. United States, Ct.Cl.1956, 140 F. Supp. 569, 572, that this factual assumption was probably not so; that is, that it seemed to have been the practice of the carriers to furnish cars of the type ordered if such cars were reasonably available; but the record now before us throws no light upon the point one way or the other.

Again, if evidence as to the availability, at the time and place of shipment, of cars of the size ordered was peculiarly within the knowledge of the carrier, it might be fair to impose upon the carrier the burden of coming forward with such evidence. That does not seem to be so in the case of the present appellee-plaintiff, which was the terminal carrier, not the initiating carrier. Also, in the circumstances of the present case, it is not clear to us that it would have been fair, even if the plaintiff had been the initiating carrier, to put upon such carrier this burden of going forward with the evidence on the point. We say this, because, due to the painfully slow pace of the post-audit by the General Accounting Office, it was not until 1950 that the government claimed a credit or offset on account of alleged overcharges in 1944—and such records as the carrier was required to keep, assuming they would have established whether smaller cars were available, were not required to be kept more than three years. See Atlantic Coast Line R. Co. v. United States, Ct. Cl.1956, 140 F.Supp. 569, 572.

On the whole, we do not think that the record before us contains suf-

ficient information to enable us intelligently to prescribe a judicially made rule as to a rebuttable presumption. Besides, the relevant factors are so complex and debatable that we probably ought not, in any event, to apply a rule of rebuttable presumption, in the absence of a prescription by the Congress on the subject.

The judgment of the District Court is affirmed.