# UNITED STATES *v.* NEW YORK, NEW HAVEN & HARTFORD RAILROAD CO.

No. 45.   Argued November 20, 1957.—Decided December 16, 1957.

*Alan S. Rosenthal* argued the cause for the United States. With him on the brief were *Solicitor General Rankin, Assistant Attorney General Doub* and *Melvin Richter.*

*Edmund M. Sweeney* argued the cause and filed a brief for respondent.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The General Accounting Office audited transportation bills of the respondent, rendered and paid in 1944, and determined that the Government was overcharged in the amount of $1,025.26. When the respondent did not refund this amount on demand, the Government exercised the right, reserved in § 322 of the Transportation Act of 1940,[1] to deduct the overpayments from a subsequent bill. The Government credited that amount against a bill of the respondent, admittedly owing, of $1,143.03 for 1950 transportation services, and paid the balance of $117.77 by check.

The respondent thereupon brought this action under the Tucker Act[2] in the District Court for Massachusetts. The complaint seeks recovery not of the $1,025.26 deducted, but of the full amount of the 1950 bill of $1,143.03. The Government's answer admits the 1950

---

[1] Section 322 of the Transportation Act of September 18, 1940, 54 Stat. 955, 49 U. S. C. § 66, provides as follows:

"Payment for transportation of the United States mail and of persons or property for or on behalf of the United States by any common carrier subject to the Interstate Commerce Act, as amended, or the Civil Aeronautics Act of 1938, shall be made upon presentation of bills therefor, prior to audit or settlement by the General Accounting Office, but the right is hereby reserved to the United States Government to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier."

[2] 24 Stat. 505, as amended, 28 U. S. C. § 1346 (a) (2).

bill but pleads its payment by the check of $117.77 and the credit of $1,025.26 in liquidation of the overcharges determined in the 1944 bills. The respondent filed a pleading in response to the government answer [3] admitting "that it did receive the check in the amount of $117.77, all as recited by the defendant, leaving the balance due and to this date unpaid in the amount of $1025.26."

The question presented in both courts below, and in this Court, is whether in this action the carrier has the burden of proving the correctness of the 1944 bills, or the Government the burden of proving that it was overcharged. The District Court held that the respondent carrier was pleading on a contract against which the Government was attempting to "set off" claims under other contracts, and that "whoever attempts to set off the other contractual claims has the burden of showing there are other claims." In the absence of government evidence proving the claimed overcharges in the 1944 bills, a motion of the respondent for summary judgment was granted. The judgment entered, however, was for $402.84, because the respondent accepted the amount of 1944 overcharges in the difference between that sum and the amount of the bill. The Court of Appeals for the First Circuit affirmed the judgment. 236 F. 2d 101. We granted certiorari, 352 U. S. 965.

Before enactment of § 322, the Government protected itself against transportation overcharges by not paying transportation bills until the responsible government officers, and, in doubtful cases, the General Accounting Office, first audited the bills and found that the charges were correct.[4] When charges were questioned the carrier

---

[3] The Pleading is captioned "Plaintiff's Answer to Defendant's Counterclaim."

[4] Government accounts generally are subject to audit prior to payment. 33 Op. Atty. Gen. 383. Prepayment examination of

was required to justify them. If administrative settlement was not reached and the carrier sued the United States to recover the amount of the bill, no one questions that it was the carrier's duty to sustain the burden of proving the correctness of the charges.[5] *Southern Pacific Co.* v. *United States,* 272 U. S. 445, 448.

Section 322, however, required the payment of such bills "upon presentation . . . prior to audit or settlement by the General Accounting Office . . . ." The audit pro-

---

claims has statutory support in several statutes. See 55 Stat. 875, 31 U. S. C. § 82b; R. S. § 3620, 31 U. S. C. § 492; R. S. § 3622, 31 U. S. C. § 496; R. S. § 3623, 31 U. S. C. § 498; R. S. § 3633, 31 U. S. C. § 514; R. S. § 3648, 31 U. S. C. § 529; 37 Stat. 375, as amended, 31 U. S. C. § 82; 55 Stat. 875, 31 U. S. C. § 82c. The claimant must furnish proof satisfactorily establishing his claim. *Charles* v. *United States,* 19 Ct. Cl. 316. Doubtful accounts and claims are transmitted to the General Accounting Office for review. Section 1 of G. A. O. General Regulations No. 50, April 21, 1926, 4 CFR § 4.1.

[5] The correctness of the 1944 bills turned on the determination of fact whether freight cars of the shorter lengths ordered by the United States were available when the initial carrier supplied cars of larger sizes. A wartime measure permitted the charging of the tariffs applicable to the cars furnished if the carrier could not supply cars of the sizes ordered. 236 F. 2d 101, 103. The General Accounting Office determined the overpayment on a finding that the documents showed that longer cars were furnished than were ordered. On the question of whether cars of the sizes ordered were available, the Government stated its position in answer to interrogations: "Such information is peculiarly within the knowledge of plaintiff [respondent] and/or the initial carrier . . . ." The ordinary rule, based on considerations of fairness, does not place the burden upon a litigant of establishing facts peculiarly within the knowledge of his adversary. Cf. *Selma, R. & D. R. Co.* v. *United States,* 139 U. S. 560, 566; *United States* v. *Denver & R. G. R. Co.,* 191 U. S. 84, 91–92. The position of the respondent herein is that the Government had all the information known to the carriers as to the availability of cars of the sizes ordered.

cedures remained substantially the same as those in effect prior to the statute but the former means of protecting against overcharges—by not paying the bills until their correctness was proved—has, by force of the statute, been replaced by the method of collecting them from subsequent bills, under the right reserved by the section to the Government "to deduct the amount of any overpayment to any such carrier from any amount subsequently found to be due such carrier." We recently said in *United States* v. *Western Pacific R. Co.,* 352 U. S. 59, 74:

". . . This right [to deduct overpayment from subsequent bills of the carrier] was thought to be a necessary measure to protect the Government, since carriers' bills must be paid on presentation and before audit."

Again at page 75:

"The fact that the Government paid the carrier's bills as rendered is without significance in light of § 322 of the Transportation Act, *supra,* requiring payment 'upon presentation' of such bills and postponing final settlement until audit."

This interpretation of § 322 finds full support in the legislative history of the section. The section was included in the omnibus transportation bill, which became the Transportation Act of 1940, in direct response to a demand of the railroads for legislation relieving them of the inordinate delays in payment of their bills attributable to the preaudit procedure, which tied up substantial amounts of accounts receivable and contributed to the financial difficulties which confronted the railroads during the depression years. The then President of the Association of American Railroads raised the issue in a letter to the Procurement Division of the Department of the Treasury dated October 5, 1937. (See Appendix to

this opinion, *post*, p. 264.) Proposed legislation in almost the identical language which became § 322 was thereupon introduced in 1938.[6] It failed of passage in the Seventy-fifth Congress and a number of similar proposals were therefore introduced in the Seventy-sixth Congress.[7] None of these passed, but in the following year the provision was included as § 322 of the Transportation Act of 1940.[8]

It is entirely clear that although the railroads sought, in the words of their spokesman, "corrective action . . . that will render impossible such long delays in payment for services rendered," to gain that end the railroads recognized that any remedy suggested on their behalf should be "both practical and legal and [one] which can easily be made operative without the assumption of any risk insofar as the Government is concerned." It was "with this thought in mind" that the railroads proposed the elimination of preaudit procedures and the prompt payment of transportation bills when rendered, with audit "after payment . . . [of] these bills referred to the General Accounting Office or such other governmental audit-

---

[6] S. 3876, 75th Cong., 3d Sess., introduced April 20, 1938 (83 Cong. Rec. 5569). H. R. 10620, 75th Cong., 3d Sess., introduced May 12, 1938 (83 Cong. Rec. 6842).

[7] See, *e. g.*, S. 1915, 76th Cong., 1st Sess., introduced March 23, 1939 (84 Cong. Rec. 3143); S. 1990, 76th Cong., 1st Sess., introduced March 30, 1939 (84 Cong. Rec. 3509). Section 1 of both of these bills dealt with the elimination of land-grant rates; § 2 with the payment of transportation bills upon presentation.

H. R. 2531, 76th Cong., 1st Sess., introduced January 13, 1939 (84 Cong. Rec. 345); H. R. 4862, 76th Cong., 1st Sess., introduced March 8, 1939 (84 Cong. Rec. 2512). Section 501 of Title V of H. R. 2531 and §§ 201 and 202 of Title II of H. R. 4862 concerned government traffic. Their provisions were substantially the same as the provisions in S. 1915 and 1990.

[8] H. R. Rep. No. 2016, 76th Cong., 3d Sess.; H. R. Rep. No. 2832, 76th Cong., 3d Sess.

ing office as might be desired for audit." The plan contemplated that "in the event . . . this audit reveals an over-payment" the same "will be promptly paid by the railway, preserving, however, the right of the carrier to make further effort to recollect in the event that it does not believe the proper charges resulted from the Government's audit." [9]

In hearings before the House Committee on Interstate and Foreign Commerce held June 1, 1938,[10] in connection with one of the bills incorporating the proposal which became § 322, the then General Counsel of the Association of American Railroads, arguing in support of the

[9] The postpayment audit of transportation bills by the General Accounting Office has been a large-scale operation since enactment of § 322. For example, the Annual Report of the Comptroller General for the fiscal year ending June 30, 1951, pages 31–32, reports that:

"During the fiscal year 1951, there was examined and reviewed in the regular audit of freight transportation payments—exclusive of special cases—a total of 633,706 vouchers covering 2,569,198 bills of lading, paid in the sum of $350,341,941 as to which there were stated for issuance 25,591 notices of overpayment totaling $6,301,799. There was examined and reviewed in the audit of passenger transportation payments a total of 400,639 vouchers covering 2,917,633 transportation requests, paid in the sum of $91,380,604, as to which there were stated for issuance 11,015 notices of overpayment totaling $672,708."

A general practice of making refunds following determination of overpayments has apparently developed under § 322. A footnote to the Government's brief states:

"We are advised by the General Accounting Office that, during the fiscal year ending June 30, 1956, carriers refunded a total of $40,941,188.78. The amount deducted from subsequent bills during that same period totaled $11,155,837.72. During the preceding fiscal year, the total amount refunded was approximately two and one-half times the amount deducted."

[10] Hearings before the Committee on Interstate and Foreign Commerce of the House of Representatives on H. R. 10620, 75th Cong., 3d Sess., June 1, 1938, pp. 34–35.

proposal, urged that "[i]f that section could be put in here, it would require the payment of the bills by the Government as they are rendered by the railroads, with the privilege, however, of course, if it should develop that there has been an overpayment, the Government may deduct that amount from subsequent bills."

The conclusion is inescapable from this history that the Congress was desirous of aiding the railroads to secure prompt payment of their charges,[11] but it is also clear that the Congress, and the railroads, contemplated that the Government's protection against overcharges available under the preaudit practice should not be diminished. The burden of the carriers to establish the correctness of their charges was to continue unabridged. The carriers were to be paid immediately upon submission of their bills but the carriers were in return promptly to refund overcharges when such charges were administratively determined. The carrier would then have "to recollect" the sum refunded by justifying its bills to the agency or by proving its claim in the courts. The footing upon which each of the parties stood when controversies over charges developed was not to be changed. The right of the United States to deduct overpayments from subsequent bills was the carriers' own proposal for securing the Government against the burden of having to prove the overpayment in proceedings for reimbursement.

In the light of this history, we are unable to agree with the holdings of the Court of Appeals that "[a]ll that § 322 does is to authorize and direct disbursing officers of the United States to pay transportation bills upon presentation, without waiting for audit or settlement by the Gen-

---

[11] The statute was broadened before final passage to apply to any common carrier subject to the Interstate Commerce Act, as amended, or the Civil Aeronautics Act of 1938. See Hearings before the Committee on Interstate and Foreign Commerce of the House of Representatives on H. R. 2531, 76th Cong., 1st Sess., p. 472.

eral Accounting Office," and that the reservation of the right of offset against subsequent bills is without significance—"We suppose that this provision was inserted out of an abundance of caution, because the availability of a setoff by the United States need not depend upon specific statutory authorization," citing *Gratiot* v. *United States,* 15 Pet. 336, 370. 236 F. 2d 101, 105.

Nor do we share the view of the Court of Appeals that "the position of the United States as shipper, so far as the present case is concerned, is no different from that of a private shipper." *Id.,* at 104. Even if we assume that "[i]f a private shipper or consignee should pay the carrier before satisfying himself of the correctness of the charges demanded—as he may be required to do pursuant to § 3 (2) of the Interstate Commerce Act, 49 U. S. C. A. § 3 (2) and regulations of the Commission thereunder—and later sues for a refund of alleged overpayments, or seeks to set off the amount of the overpayments against another claim admittedly due, in either case the shipper or consignee would have the burden of alleging and proving the fact and the amount of such overpayment," [12] the Court of Appeals overlooks the fact that the Government's statutory right of setoff was designed to be the substantial equivalent of its previous right to withhold payment altogether until the carrier established the correctness of its charges. Thus the issue of overcharges, after the enactment of § 322, arises in a different way, but the differing procedures by which the issue is presented should not control the placement of the

---

[12] The private shipper must pay freight charges promptly and has no expressed right of offset of any overpayment against charges for other transportation services. 24 Stat. 380, as amended, 49 U. S. C. § 3 (2). A limited exception allows carriers to extend credit for a period of 96 hours to private shippers under prescribed conditions and limitations. *Ex parte No. 73,* 57 I. C. C. 591.

burden of proof.[13]   In effect the situation is that the railroad is suing to recover amounts which the Government initially paid conditionally, and then recaptured, under the § 322 procedure.   We therefore hold that the burden of the carrier to establish the lawfulness of its charges is the same under § 322 as it was under the superseded practice.

Similarly, conventional principles of contractual setoff should not govern the determination of the carrier's burden of proof in this action merely because the complaint

---

[13] Compare the practice followed in the Court of Claims, which has concurrent jurisdiction with the District Court of actions under the Tucker Act.  A "Memorandum Order as to Procedure in Common Carrier Cases," issued March 11, 1953, by the Court of Claims (now, with some amendments, included as Appendix B in the Rules of the Court of Claims, revised December 2, 1957), expressly defines the "dispute" in cases of the instant kind, among others, brought in that court:

"The word 'dispute'. . . means the shipment or shipments with respect to which the General Accounting Office or other agency of the Government determined that the carrier's charges had been overpaid . . . rather than subsequent shipments which are not in dispute except for the fact that the overpayments determined as to the shipments in dispute have been deducted from the amount of the carrier's bills covering such subsequent shipments."

The memorandum prescribes a procedure for the framing of the issues arising from the "dispute" as so defined.   The carrier bringing the action must furnish a detailed schedule as to "each of the carrier's bills for the shipments in dispute" and is required also to file, at the time of its petition or within 30 days thereafter, "a request for admission by the defendant [United States] of the genuineness of any relevant documents described in and exhibited with the request and of the truth of the material matters of fact relied on by the carrier for recovery in the action."   The statements are expressly required to be "sufficiently explicit to show the nature of the dispute and the specific reason or reasons why the plaintiff believes it is entitled to recover higher rates or charges than those allowed by the Government."   Failure to comply with the requirements of the memorandum may be cause for the imposition of sanctions, including dismissal of the carrier's petition.

frames an action for recovery of the full amount of the 1950 bill rather than the amount deducted therefrom. The respondent's brief concedes that "[w]henever a railroad brings an action against the Government, directly upon the deduction [as, on the facts of the case, to recover the alleged 1944 overpayments], it has the burden of alleging and proving the facts of the case and establishing the validity of its claim in the light of the contract and the applicable tariffs." There is also authority that the plaintiff has the same burden, although suing on the subsequent bill, when the claim for damages is for the amount of the deduction. *Suncook Mills* v. *United States,* 44 F. Supp. 744; *Eastport S. S. Co.* v. *United States,* 131 Ct. Cl. 210, 130 F. Supp. 333; *Buch Express, Inc.* v. *United States,* 132 Ct. Cl. 772, 132 F. Supp. 473.[14] We do not see that a different issue was shaped by the pleadings in this action. Cf. *Wisconsin Central R. Co.* v. *United States,* 164 U. S. 190, 212. Although the *ad damnum* clause of the complaint prays recovery of $1,143.03, respondent's pleading filed in response to the Government's answer admits the government payment of $117.77, and that the actual controversy concerns the balance of $1,025.26. The true dispute between the parties, arising from the determination and collection of the overpayments as authorized by § 322, involves the lawfulness of the 1944 bills. It is the substance, not the form, which should be our concern. Cf. *Alcoa S. S. Co.* v. *United States,* 338 U. S. 421; *Reynolds* v. *United States,* 292 U. S. 443. We hold that the respondent is entitled to recover only if it satisfies its

---

[14] But see *Atlantic Coast Line R. Co.* v. *United States,* 136 Ct. Cl. 1, 140 F. Supp. 569, 572. The Court of Claims there indicated that the burden would be on the United States while holding that the railroad had the duty to provide all the information it had on the issue of availability of cars.

burden of proving that its 1944 charges were computed at lawful and authorized rates.

We do not here intimate that the administrative determination of overpayment has binding effect in the judicial proceeding, see *Wisconsin Central R. Co.* v. *United States, supra,* at 211; *Grand Trunk Western R. Co.* v. *United States,* 252 U. S. 112, 120–121; and we agree with the Court of Appeals that the extrinsic fact, namely the availability of the freight cars in the sizes ordered, remains to be proved in the suit. Our conclusion is that the burden in that respect is upon the carrier.

The judgment of the Court of Appeals is reversed with direction to remand the case to the District Court for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*

MR. JUSTICE FRANKFURTER dissents, on the basis of the opinion of Chief Judge Magruder in the court below, 236 F. 2d 101, and more particularly because the respondent was not the initial carrier.

## APPENDIX TO OPINION OF THE COURT.

The letter, dated October 5, 1937, was addressed by J. J. Pelley, President of the Association of American Railroads, to Captain H. E. Collins, Assistant Director, Procurement Division, Treasury Department, and reads:

"Dear Captain COLLINS:

"The railroads members of the Association of American Railroads, which comprise about 98% of all the Class I railroads in the United States, have been very much concerned by the long delay in securing payment for transportation services rendered for the U. S. Government. We know further, from conferences with the officers of the American Short Line Railroad Association,

that their lines have been and are experiencing similar difficulty. These delays are not justified and the carriers should not be expected to finance the Government as they are now doing, insofar as transportation is concerned. Furthermore, the railroads are necessarily large borrowers and in that connection are required as a condition to their obtaining the necessary capital to pay substantial interest charges on all such borrowed money, whereas on the other hand the Government is paying no interest on its delayed payments to the railroad companies, which delays in many instances run over a year and invariably are not settled for sixty to ninety days. Although the railroads pay interest for the money they borrow, they cannot under the law collect interest from the Government no matter how long settlements may be delayed. This is obviously unfair.

"Under the law applicable to commercial shippers, transactions with railroads are required to be on substantially a cash basis. Shippers are required to pay freight charges within 48 hours, on a majority of the traffic, and in no case are they permitted credit in excess of 96 hours. It appears to us, and particularly under the present unfortunate financial position of the railroads, that the carriers ought to receive settlement from the Government within 96 hours after a bill has been presented and that would be possible providing the proper machinery were set up and the proper instructions issued.

"This matter is of very much greater importance today than it has been in years past, for the reason that under present conditions the Government is engaged in shipping to a very much greater extent than ever before. Due to the various bureaus and other agencies, particularly in connection with relief work and in connection with some of the governmental corporations that have been organized, the Government is today handling much tonnage which was previously commercial traffic so that the delay

in settlement for the transportation charges is much more serious to the railroads today than would have been the case a decade ago. It should also be borne in mind in connection with Government freight shipped under Government bills of lading the railroads are under the law not assessing their commercial rates but are making such discounts as the law requires because of land-grants and which in many instances today means the handling of this traffic on a basis below the actual cost of performing the service. These facts are mentioned only as indicating the very great importance of providing some sort of a system which will permit the more prompt payment of these charges.

"That you may have a picture of the situation, your attention is directed to the fact that as of July 1, 1937, there were 94,182 outstanding unpaid railroad bills against the Government amounting to $11,749,774, all of which bills had been rendered prior to May 1, 1937, and of these bills and this amount there was unpaid $4,683,946, representing 35,761 bills which had been rendered prior to January 1, 1937.

"We feel very sure that you and the other officers of the Government will agree that this situation is one that is grossly unfair and that corrective action should be taken that will render impossible such long delays in payment for services rendered.

"We are also of the opinion that it is not sufficient for us to simply complain of this situation but that in addition thereto we ought to suggest a remedy which in our judgment is both practical and legal and which can easily be made operative without the assumption of any risk insofar as the Government is concerned, providing you and your associates will put the suggested plan in operation and with such instructions issued as may be needed in connection therewith. With this thought in mind, we

very respectfully submit for your consideration the following:

"We believe that the delay in the payment of transportation charges by the Government to the railroads would be absolutely avoided if the various departments contracting for transportation were instructed to pay the bills as rendered and after payment have these bills referred to the General Accounting Office or such other governmental auditing office as might be desired for audit. In the event that this audit reveals an over-payment, then claim be presented to the carrier for the amount thereof which will be promptly paid by the railway, preserving, however, the right of the carrier to make further effort to recollect in the event that it does not believe the proper charges resulted from the Government's audit. Attention is further directed to the fact that the railroads would never have, under such a plan, more money than the Government lawfully owed for the reason that the Government is shipping daily and is currently obligated to the railroad companies for transportation charges. This would place the handling of governmental transportation charges on substantially the same basis as applies in connection with commercial transactions.

"I am very sure from our previous negotiations with you and others connected with the Government with regard to the same subject that there exists no differences as between us as to the necessity of more prompt payment than has heretofore prevailed. I hope that you and your associates may consider the suggestions contained herein as reasonable and practical and that we may rely upon your good offices to bring about some such arrangement. It may be that you may desire to discuss this matter and perhaps make some suggestions that differ somewhat from the plan proposed herein. Should this situation develop, I want to assure you that either the

officers of this Association or the appropriate officers of this Association with a committee of the lines will gladly discuss the subject with you at such time and place as may be mutually satisfactory. I feel sure that we both desire to obtain a very substantial improvement in the situation that now exists, and I am of the opinion that if these matters can be handled along lines somewhat similar to those which we have recommended that it will not only create a much better feeling as between the railroads and the Government, but in addition thereto will materially reduce the expenditures of both parties in the handling of these accounts and give to the railroads money which is due and greatly needed.

"With very kindest regards, I beg to remain.

"Yours most cordially,

"(Signed) J. J. PELLEY."