561 F.2d 913
 183 U.S.App.D.C. 20, 5 O.S.H. Cas.(BNA) 1555,
1977-1978 O.S.H.D. ( 21,916
 GAF CORPORATION, Petitioner,
v.
OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and John T.
Dunlop, Secretary of Labor, Respondents,
United Paperworkers Int'l Union, Local 691, Intervenor.
 No. 76-1028.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 25, 1977.
Decided June 28, 1977.
As Amended July 13, 1977.
Rehearing Denied Sept. 22, 1977.
 
 Ira J. Smotherman, Jr., Atlanta, Ga., with whom McNeill Stokes, Atlanta, Ga., was on the brief, for petitioner.
 Nancy L. Southard, Atty., U. S. Dept. of Labor, Washington, D. C., with whom Michael H. Levin, Counsel for Appellate Litigation, and Allen H. Feldman, Asst. Counsel for Appellate Litigation, U. S. Dept. of Labor., Washington, D. C., were on the brief, for respondents.
 Miriam L. Gafni, Philadelphia, Pa., with whom Richard H. Markowitz, Philadelphia, Pa., and George M. Cohen, New York City, were on the brief, for intervenor.
 Before TOM CLARK,* Retired Associate Justice of the Supreme Court of the United States, and MacKINNON and ROBB, Circuit Judges.
 Opinion for the Court filed by ROBB, Circuit Judge.
 Special concurring opinion filed by MacKINNON, Circuit Judge.
 Mr. Justice CLARK concurred in the opinion of the Court but died before it was entered.
 ROBB, Circuit Judge:
 
 
 1
 GAF Corporation (GAF) petitions for review of an order of the Occupational Safety and Health Review Commission (the Commission). The challenged order found GAF in violation of a regulation requiring employers to provide medical examinations to workers exposed to airborne concentrations of asbestos. GAF employees are exposed to asbestos dust during the manufacture of floor coverings and fiber building products. GAF contends that the Commission misinterpreted the regulation and that in any event the regulation is void. We conclude that neither of these contentions is correct and accordingly we affirm.
 
 I. BACKGROUND
 
 2
 This dispute began in 1973 when the Secretary of Labor (the Secretary) issued citations charging GAF with violations of 29 C.F.R. § 1910.93a(j) (subsequently renumbered to § 1910.1001(j)).[1] The cited regulation requires employers to provide certain pre-employment, annual, and separation medical examinations to all workers "in an occupation exposed to airborne concentrations of asbestos fibers . . . ."
 
 
 3
 GAF does not provide the specified examinations, but argues that the regulation does not require them, given the low levels of airborne asbestos at GAF's plants. At the time of the citation, which involved two of GAF's plants, the level at both plants was below the maximum permissible level. (The maximum permissible level at that time was 5 fibers, of more than 5 micrometers in length, per cubic centimeter of air. See 29 C.F.R. § 1910.93a(b).) GAF contends that the regulations require medical examinations only if the concentration of airborne asbestos exceeds this maximum level or some other level higher than that found in GAF's plants. The Secretary argues that the presence of any airborne asbestos at all triggers the requirement for medical examinations.
 
 
 4
 GAF challenged the citations throughout the levels of administrative review provided by the Occupational Safety and Health Act of 1970 (the Act), 29 U.S.C. § 659 (1970). In due course the Commission upheld the citations. Secretary of Labor v. GAF Corp., 75 OSAHRC Rep. 3/A2 (microfiche). GAF then petitioned this court seeking review of the Commission's order as provided by the Act. See 29 U.S.C. § 660 (1970).
 
 
 5
 GAF contends that the Commission erred in interpreting the regulation to require medical examinations for employees exposed to the relatively low concentrations of airborne asbestos found in GAF's plants. GAF also contends that the regulation is void because it was improperly promulgated, is inconsistent with the Act, and is arbitrary, irrational, and unsupported by the evidence. We shall consider each of these contentions in turn.
 
 A. Interpretation of the Regulation
 
 6
 We turn first to GAF's contention that the Commission erred in upholding the Secretary's interpretation of the disputed regulation. GAF is supported by neither the language nor the history of the regulation.
 
 
 7
 We note at the outset that the Secretary is charged by law with administering the Act and the regulations supporting it. 29 U.S.C. §§ 655 et seq. (1970). Hence, his interpretation of the regulation "becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Udall v. Tallman, 380 U.S. 1, 16-17, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). The Secretary's interpretation remains controlling "even though the chosen exegesis may not appear quite as reasonable as some other construction." (citation omitted) Budd Co. v. Occupational Safety and Health Review Commission, 513 F.2d 201, 205 (3rd Cir. 1975); accord, Clarkson Const'n Co. v. Occupational Safety and Health Review Commission, 531 F.2d 451, 457 (10th Cir. 1976). Furthermore, the standards must be construed, as they were construed by the Secretary, to protect the employees. See Brennan v. Occupational Safety and Health Review Commission, 491 F.2d 1340, 1344 (2d Cir. 1974).
 
 
 8
 The Secretary's interpretation of the regulations not only satisfies the standards discussed above; it is far more reasonable than the interpretation urged by GAF.
 
 
 9
 GAF bases its argument upon the language of the regulation, which requires medical examinations for those "in an occupation exposed to airborne concentrations of asbestos fibers . . . ." 29 C.F.R. § 1910.93a(j). The Secretary interprets this language as requiring examinations for those in occupations exposed to any level of asbestos. GAF, in contrast, argues that the word "concentration" implies a quantitative amount. Because the disputed section does not specify any quantity of asbestos, GAF reasons that the section should be read to include the 5-fiber limit of 29 C.F.R. § 1910.93a(b), or at least some other quantitative limit greater than the level found in GAF's plants.
 
 
 10
 GAF's argument flies in the face of the language of the regulation. It would be a unique regulation indeed which managed to impose a quantitative limitation by not mentioning any quantity at all. Furthermore, a detailed examination of the regulation reveals that the omission of the quantitative limit was deliberate.
 
 
 11
 As originally proposed, the requirement of examinations was triggered by the presence of a specific quantity of asbestos:
 
 
 12
 Medical Examinations. The employer shall provide, or make available at his cost, appropriate medical examinations on a periodic basis to any employee who is exposed to asbestos dust in excess of the limits specified in paragraph (a) of this section (5 fibers per cubic centimeter).
 
 
 13
 37 Fed.Reg. 468 (1972).
 
 
 14
 The final standard, however, deletes the reference to a specific concentration. The preamble to the final standard notes that several changes have been made to the proposed regulation, and then states that medical examinations are now required for "every employee exposed to airborne concentrations of asbestos." (emphasis supplied) 37 Fed.Reg. 11319 (1972). The preamble makes no mention of any specific quantity of asbestos. Nor does the final regulation itself. Instead, the final regulation requires examinations for those "in occupations exposed to airborne concentrations of asbestos fibers . . . ." The regulation states this requirement not once, but three times, in almost identical language: once each in the paragraphs requiring preplacement, annual, and termination examinations. See 29 C.F.R. §§ 1910.93a(j)(2)-(4). In contrast, 29 C.F.R. § 1910.93a(g)(1)(i) requires posting of caution signs "where airborne concentrations of asbestos fibers may be in excess of the exposure limits prescribed in paragraph (b) of this section." (emphasis added)
 
 
 15
 We think these considerations leave room for only one conclusion: the disputed regulations require medical examinations for all those in occupations exposed to airborne asbestos in any measurable concentration.[2]
 
 B. Validity of the Regulation
 
 16
 GAF contends that, even if the Secretary correctly interpreted the regulation, it is void on a number of grounds. We find this contention to be without merit.
 
 
 17
 Although we have carefully considered all GAF's arguments concerning the validity of the regulation, only four merit discussion here. These are GAF's contentions that the regulation is arbitrary and unsupported by evidence; that the regulation is inconsistent with the Act; that the Secretary's interpretation is inconsistent with his approval of a California occupational safety plan; and that the federal regulation was improperly promulgated.
 
 
 18
 GAF argues first that the regulation is arbitrary and unsupported by evidence. GAF bases this argument partly upon the recommendation of the National Institute for Occupational Safety and Health (NIOSH). NIOSH was created by the Act for the purpose of developing health and safety standards and recommending them to the Secretary. 29 U.S.C. § 671 (1970). NIOSH recommended to the Secretary that medical examinations be required where airborne asbestos concentrations exceed 1 fiber per cubic centimeter of air. National Institute for Occupational Safety and Health, criteria for a recommended standard . . . Occupational Exposure to Asbestos at I-3 (1972) (cited hereafter as "NIOSH criteria"). The Secretary rejected this recommendation and instead required medical examinations for those exposed to any concentration of airborne asbestos.
 
 
 19
 GAF contends that this rejection by the Secretary was arbitrary and unsupported by the evidence, and especially arbitrary because NIOSH stated that its recommended standard included a "Safety factor". NIOSH criteria at II-2.
 
 
 20
 We have previously held that the Secretary is not bound by NIOSH recommendations. Industrial Union Department v. Hodgson, 162 U.S.App.D.C. 331, 340-41, 499 F.2d 467, 476-77 (1974). And in this case the Secretary's departure from the NIOSH recommendation is reasonable. NIOSH noted that concentrations as low as 1.2 fibers per cubic centimeter have been known to cause serious diseases. Furthermore, NIOSH noted, the state of knowledge concerning asbestos-related diseases is such that no exposure standard other than zero would assure freedom from such diseases. NIOSH criteria at III-23, III-9. Hence the Secretary acted reasonably and on substantial evidence in requiring medical examinations for those exposed to any concentration of airborne asbestos rather than limiting examinations to those exposed to more than 1 fiber per cubic centimeter.
 
 
 21
 GAF argues next that even if the challenged regulation is supported by evidence, the regulation is invalid because it is inconsistent with the Act. GAF contends that the examinations are in effect being used as a form of medical research, because some useful knowledge will probably be gained from them. Under the Act, GAF continues, the Secretary of Health, Education, and Welfare (HEW) must pay for medical examinations used as research. Hence the challenged regulation, by requiring GAF to supply medical examinations at its own expense, contravenes the statute.
 
 
 22
 GAF misconstrues the Act and its effect upon the challenged regulation. The Act does not require the Secretary of HEW to pay for medical examinations used as research; it merely permits him to do so. The Act provides:
 
 
 23
 In the event such medical examinations are in the nature of research, as determined by the Secretary of Health, Education, and Welfare, such examinations may be furnished at the expense of the Secretary of Health, Education, and Welfare. (emphasis supplied)
 
 
 24
 29 U.S.C. § 655(b)(7) (1970). Thus, the Act clearly vests the Secretary of HEW with discretion to determine whether the examinations are in the nature of medical research and if so, whether to pay for them. His determination in this regard may be reversed only for an abuse of discretion.
 
 
 25
 We note initially that no decision of the Secretary of HEW in this matter is before the court. In any event, a review of the challenged regulation convinces us that the examinations in issue are not "in the nature of medical research" and are thus properly chargeable to GAF. GAF cannot seriously contend that the examinations are primarily designed to further medical research rather than to protect employees exposed to asbestos dust. As we have noted above, NIOSH found that non-zero exposure limits alone could not guarantee the prevention of asbestos-induced disease. NIOSH criteria at III-9. Consequently, NIOSH recommended periodic medical examinations for the protection of the workers, noting:
 
 
 26
 The major objective of such surveillance will be to ensure proper medical management of individuals who show evidence of reaction to past dust exposures, either due to excessive exposures or unusual susceptibility. Medical management may range from recommendations as to job placement, improved work practices, cessation of smoking, to specific therapy for asbestos-related disease or its complications.
 
 
 27
 NIOSH criteria at I-3. And in promulgating the final regulation, the Secretary of Labor noted the hazards connected with long-term exposure to asbestos dust and concluded, "the conflict in the medical evidence is resolved in favor of the health of employees." 37 Fed.Reg. 11318 (1972). Finally, the Secretary specified in the regulation that records of the medical examinations in question would be kept by the employer, whereas the Act requires that records of examinations used as medical research be forwarded to the Secretary of HEW. 29 C.F.R. § 1910.93a(j)(6); 29 U.S.C. § 655(b)(7) (1970).
 
 
 28
 These factors considered together clearly indicate that the examinations at issue are to be provided primarily for the protection of GAF's employees rather than for the purposes of medical research. Consequently, the challenged regulation does not contravene the section of the Act permitting the Secretary of HEW to pay for medical examinations conducted as medical research.
 
 
 29
 GAF argues that even if the challenged regulation is supported by evidence and consistent with the Act, the Secretary of Labor's interpretation of the regulation is inconsistent with his approval of a California occupational health and safety plan.
 
 
 30
 The alleged inconsistency arises because the California plan, like the NIOSH recommendation for a federal standard, requires medical examinations only if the employees may be exposed to concentrations of asbestos greater than 1 fiber per cubic centimeter. General Industry Safety Orders 8 Cal.Admin. Code Ch. 4, Subch. 7 § 5208(j). The Secretary may approve of a state plan and permit the state to take over some enforcement functions of the federal government, but only if the state plan "provides for the development and enforcement of safety and health standards . . . which standards (and the enforcement of which standards) . . . will be at least as effective in providing safe and healthful employment . . . as the standards promulgated under section 655 of this title . . . ." (emphasis supplied) 29 U.S.C. § 667(c) (1970).
 
 
 31
 The Secretary has approved the California plan. 38 Fed.Reg. 10717-20 (1973); 41 Fed.Reg. 1904-06 (1976). This approval, GAF argues, indicates that the California plan is "at least as effective" as the federal scheme. Consequently, GAF contends, the Secretary's approval of the California plan is a tacit admission that the federal regulation does not require medical examinations when asbestos concentrations are less than 1 fiber per cubic centimeter.
 
 
 32
 We cannot agree with GAF's reasoning. In approving the California plan, the Secretary clearly evaluated the plan as a whole, discussing not only limits for various toxins, but enforcement, notice, record-keeping, and sanction requirements as well. 38 Fed.Reg. 10717-20 (1973); 41 Fed.Reg. 1904-06 (1976). The Secretary noted that California would provide more enforcement personnel than the federal program. 38 Fed.Reg. 10718 (1973). Hence, it was reasonable for the Secretary to conclude that the California standards as enforced would be "at least as effective" as the federal standards despite differences in the triggering concentrations of asbestos.
 
 
 33
 GAF argues finally that, even if the Secretary correctly interpreted the federal regulation, and even if the regulation is consistent with the Act, supported by the evidence and consistent with the California plan, the federal regulation is void because it was improperly promulgated. GAF's argument is as follows: the Act requires that each proposed regulation be published in the Federal Register to permit public comment. 29 U.S.C. § 655(b) (1970). In this case the Secretary published a proposed regulation but then made changes in it before publishing it in final form. GAF argues that the amended rule should first have been published as a new proposed rule, with opportunity for public comment before being promulgated as a final regulation.
 
 
 34
 The short answer to this contention is that GAF never raised this objection before the Commission and is therefore precluded from raising it here. The judicial review provision of the Act provides that "no objection that has not been urged before the Commission shall be considered by the court . . . ." 29 U.S.C. § 660(a) (1970). Furthermore, as this court has previously noted:
 
 
 35
 The requirement of submission of a proposed rule for comment does not automatically generate a new opportunity for comment merely because the rule promulgated by the agency differs from the rule it proposed, partly at least in response to submissions. 51
 
 
 36
 51. A contrary rule would lead to the absurdity that in rulemaking under the APA the agency can learn from the comments on its proposals only at the peril of starting a new procedural round of commentary. (footnote in original)
 
 
 37
 International Harvester Co. v. Ruckelshaus, 155 U.S.App.D.C. 411, 428, 478 F.2d 615, 632, n. 51 and accompanying text (1973); accord, South Terminal Corp. v. E.P.A., 504 F.2d 646, 659 (1st Cir. 1974). We think the same principle governs GAF's contention in this case, and accordingly we reject GAF's argument.
 
 
 38
 In conclusion, we hold that the Secretary's interpretation of the disputed regulation is reasonable, and that the regulation is supported by the evidence, consistent with the California plan, and was properly promulgated. GAF's petition to review and reverse the decision of the Occupational Safety and Health Review Commission is denied.
 
 
 39
 So Ordered.
 
 
 40
 MacKINNON, Circuit Judge, concurring specially:
 
 
 41
 Because the "concentrations" of asbestos fibers found in the GAF plants in this case were not insignificant, and because the record shows that petitioner had adequate notice that the Commission would construe its regulation to require physical examinations at these "concentrations," I reluctantly concur in the result reached by the panel. I believe, however, that the Secretary of Labor should clarify the regulation governing medical examinations so as to give other persons subject to the regulation reasonable notice of some measurable quantity of airborne asbestos the Commission intends to trigger the medical examination requirement. Merely to state that all employers must provide medical examinations whenever their employees are exposed to "concentrations" of asbestos fibers does not provide an ascertainable standard for those who wish to comply with the law.
 
 
 42
 The regulation provides that employers must provide medical examinations to each employee "in an occupation exposed to airborne concentrations of asbestos fibers," 29 C.F.R. § 1910.1001(j)(2) and (3) (1976) (emphasis added). No person can discern from this language what degree of "concentration( )" must exist before medical examinations are required. Other asbestos exposure regulations which do set ascertainable exposure limits provide:
 
 
 43
 (b) Permissible exposure to airborne concentrations of asbestos fibers. (1) Standard effective July 7, 1972. The 8-hour time-weighted average airborne concentrations of asbestos fibers to which any employee may be exposed shall not exceed five fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
 
 
 44
 (2) Standard effective July 1, 1976. The 8-hour time-weighted average airborne concentrations of asbestos fibers to which any employee may be exposed shall not exceed two fibers, longer than 5 micrometers, per cubic centimeter of air, as determined by the method prescribed in paragraph (e) of this section.
 
 
 45
 29 C.F.R. § 1910.1001(b)(1) and (2) (1976). The prescribed standards in these regulations were: "five fibers, longer than 5 micrometers, per cubic centimeter of air," and after July 7, 1976, "two fibers." These standards inform the nation's employers precisely what degree of exposure is permitted and what exposure is excessive, but the regulation requiring medical examinations is almost completely deficient in this respect.
 
 
 46
 What number of fibers, of what length, per what volume of air will constitute a "concentration" is nowhere stated or even hinted at and like the regulation, the court's opinion leaves the matter completely to conjecture. This is particularly unsettling to law abiding citizens when the agency is dealing with tremendously minute quantities of infinitesimally small particles. It makes compulsory law enforcement difficult and it lessens the likelihood of voluntary compliance with the law, a result devoutly to be wished. The first requirement for uniform and voluntary compliance with the law is a clear understandable statement of what conduct is required and this regulation falls woefully short of that minimal requirement.
 
 
 47
 Regulations that have the great importance that this regulation has to human life should be written in more precise terms so people of ordinary understanding can determine what course of conduct is being required of them. What one person might consider to constitute a "concentration" will differ greatly from the interpretation that another would give to that term; and what one person today might regard not to constitute a concentration" might be considered tomorrow, on the basis of hindsight as medical knowledge increases, to come within that term.[1]
 
 
 48
 The statute requires the Secretary to "set (a) standard":
 
 
 49
 (5) The Secretary, in promulgating standards dealing with toxic materials or harmful physical agents under this subsection, shall set the standard which most adequately assures, to the extent feasible, on the basis of the best available evidence, that no employee will suffer material impairment of health or functional capacity even if such employee has regular exposure to the hazard dealt with by such standard for the period of his working life. Development of standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the employee, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws. Whenever practicable, the standard promulgated shall be expressed in terms of objective criteria and of the performance desired.
 
 
 50
 29 U.S.C. § 655(b)(5) (1970) (emphasis added). The agency has promulgated standards that state "objective criteria and . . . the performance desired" for employee exposure on the job but it has not done as much for medical examinations. It is practical to state "objective criteria" for medical examinations and I believe the agency should do so. Merely requiring medical examinations whenever there is some indefinite, ambiguous, nonspecific degree of "concentration" does not meet the requirement for a feasible standard with objective criteria that Congress imposed on the agency.[2] This is a serious dereliction because, if in the future medical knowledge progresses to the point where more minute quantities of asbestos fibers are found to be harmful than are presently so considered, then employers in the distant future may be held liable to the extent of millions of dollars in tort suits based on their alleged failure to provide the required medical examinations that would have prevented, or discovered at a preventable stage, what eventually turned out to be a fatal disease.
 
 
 51
 In such lawsuits for damages the present ambiguous regulation would have the status of a statute and failure to conform to some more strict post hoc interpretation of its provisions might constitute negligence per se. As Professor Prosser states the law:
 
 
 52
 Once the statute is determined to be applicable which is to say, once it is interpreted as designed to protect the class of persons in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation the great majority of the courts hold that an unexcused violation is conclusive on the issue of negligence, and that the court must so direct the jury. The standard of conduct is taken over by the court from that fixed by the legislature, and "jurors have no dispensing power by which to relax it," except in so far as the court may recognize the possibility of a valid excuse for disobedience of the law. This usually is expressed by saying that the unexcused violation is negligence "per se," or in itself.
 
 
 53
 W. Prosser, Torts 200 (4th ed. 1971). When it can be avoided, a statute or regulation should not by its mere indefiniteness expose employers to such great hazards.[3] The agency should state in clear, understandable objective terms specifically what degree of "concentration" triggers the requirement for medical examinations be it one fiber per cubic foot of air or one fiber per 100 cubic feet of air, or some other unambiguous, quantitative standard. Imposing a non-specific ambiguous standard is completely unsatisfactory. "Concentration" is a noun, the meaning of which varies greatly depending upon the context in which it is used. Concentration can be high, low, medium, dangerous, hazardous, insignificant, "negligible," etc. standing alone its meaning is highly indefinite. It would not be difficult to state a standard with precision.
 
 
 54
 A recent case before the Connecticut Occupational Safety and Health Review Commission, Tuttle & Bailey Div. of Allied Thermal Corp., No. 76-315 (Conn. OSAHRC, Dec. 3, 1976), involved a state medical examination requirement in language practically identical to that present here, and a similar factual situation. In that case the State Commission decided that the word "concentration" in the standard must have been intended to have some meaning, because if no threshold of exposure were intended, the word "concentration" could be omitted without changing the meaning of the section. It would then address itself to "airborne asbestos fibers." The State Commission reasoned:
 
 
 55
 If this Commission were to adopt the interpretation as proposed by the Labor Commissioner, the effect would be to establish a requirement ". . . that whenever employees are exposed to any trace of asbestos no matter how temporary or insignificant their employer must furnish (and employees must undergo) annual physical examination and tests as prescribed in (the regulation)." . . .
 
 
 56
 This Review Commission cannot conclude that the intent of this regulation is to require such examination for the occasional "messenger" or "visitor" entering the exposure area, nor the employee far removed from the source whose exposure is in fact minimis concentration of airborne asbestos fibers. The Review Commission concludes that the word "concentration" has a meaning as used within the regulation.
 
 
 57
 Id. at 5-6.
 
 The Commission also noted:
 
 58
 One can conceive of very different circumstances wherein employees would be exposed to airborne concentration of asbestos fiber, to varying degrees and for varying periods of time. For an employer to try to determine whether or not medical examination(s) as required by (the regulation) should be provided or not provided under a "reasonable man" theory would be most difficult. To attempt to apply a "reasonable person" standard in recognizing a hazard of microscopic concentration of asbestos fiber in the air, is not in itself reasonable. Reasonable laymen cannot conceive a rule of conduct in an area where reasonable experts cannot agree.
 
 
 59
 Id. at 6-7 (emphasis added). The Commission therefore concluded that it was
 
 
 60
 unable to determine what (the) threshold (of concentration) is or should be, nor does this Commission accept that a reasonable employer could so determine.
 
 
 61
 Id. at 7. Finally, it held that until the regulation was redrafted to state its intended meaning in clear understandable terms, the Commission would assume that the 5 fiber standard applied as well to the physical examination provision. The State Commission appeared to recognize that this interpretation was not directly supported by the language of the regulation, but based its holding on the necessity for some understandable meaning. If the instant case were disposed of on a similar rationale, the two-fiber limit presently in force in 29 C.F.R. § 1910.1001(b)(2) would also govern the medical examination requirement.
 
 
 62
 Recently, the Federal Commissioners attempted to distinguish their decision presently under review on the ground that "GAF did not involve the situation . . . where the concentration of the air contaminant is negligible compared to the limit established by the standard." Western Electric, Inc., No. 8902, at 7 (OSHRC, Jan. 24, 1977) (emphasis added). What "standard" the Commission had in contemplation was not disclosed, nor was there any reference to what "limit" they were applying. But the reference of the Commission to a "negligible" amount indicates some quantitative standard was intended. It would be helpful if the Secretary would state what that "standard" is. That is not a difficult task if he has one in mind. If he does not have one in mind he should have. Maybe the Secretary does not have substantial evidence to prove that the "standard" of "concentration" the Commission applying constitutes a "hazard," and that may be the reason the Secretary chose to leave it in an ambiguous state. As it is now, both the Secretary and the Commission are home free leaving the public in the dark as to what degree of "concentration" is more than "negligible" according to some unstated "standard" of "concentration."
 
 
 63
 Such imprecision should not be countenanced in such an important matter. Nothing would be lost by requiring the agency to state a specific objective standard and everybody would benefit. It could be done quickly and there would not be any delay in enforcement.
 
 
 64
 It is also my opinion that permitting the entire state of California to have a specific standard that is different, and more liberal, from that applied to appellants in this case, and throughout the rest of the nation, is highly questionable. The mere availability of more investigators in California is not a permissible basis for allowing employees to be exposed to more asbestos fibers before a medical examination is required. The number of investigators is not germane to the hazard produced by the added contamination of more asbestos fibers.
 
 
 65
 The evidentiary record in this case does not in my opinion present a case of sufficient strength to justify setting aside the regulation, but there is every indication that a proper case can be made to achieve such result. I accordingly strongly suggest that the Secretary should amend the regulation to establish the definite workable and understandable "standard" with "objective criteria" that the statute requires.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 294(a)
 
 
 [1]
 29 C.F.R. § 1910.93a was recodified as 29 C.F.R. § 1910.1001 on May 28, 1975. 40 Fed.Reg. 23072 (1975). The regulation will be cited throughout this opinion as § 1910.93a, to reflect the codification in effect at the time of the alleged violations
 
 
 [2]
 We are aware that the Occupational Safety and Health Review Commission of the state of Connecticut reached a contrary conclusion in interpreting a state regulation virtually identical to the federal regulation before this court. Commissioner of Labor v. Tuttle & Bailey Division of Allied Thermal Corp., Docket No. 76-315, December 3, 1976. Nevertheless we feel that the deference due the Secretary's interpretation, along with the plain language and history of the federal regulation, compel the conclusion we reach here
 
 
 [1]
 A current textbook tells us:
 The toxic concentration of asbestos in the air has not been established. However, the threshold limit values for its concentration in air with eight hours' exposure daily has been accepted as 5 million particles per cubic foot of air, based on impinger samples counted by the light-field technique.
 
 
 [4]
 R. Gray, Attorney's Textbook of Medicine 132-71 (3d ed. 1977). The evidence in this record does not indicate how this sampling method might vary from the Commission's two fibers per cubic centimeter in 29 C.F.R. § 1910.1001(b)(2) (1976); however, this standard permits less than 1/60th the number of fibers Gray finds acceptable. The Commission's interpretation of § 1910.1001(j)(2) and (3) establishes an even lower indeterminate figure for the medical examination requirement
 
 
 [2]
 It is conceded that the regulation requiring medical examinations is imposed under the Secretary's authority to "promulgate standards dealing with . . . harmful physical agents . . . ." 29 U.S.C. § 655(b)(5), supra
 
 
 [3]
 The potential problem of tort liability is particularly serious because of a high background level of asbestos fibers in many geographic areas. Some medical studies are currently reported to have "found (that) people who have never been exposed to asbestos in the workplace show a scarring of tissues around their lungs that looks exactly like scarring found in asbestos workers." Area Dust Found High in Asbestos Fibers, Washington Post, Dec. 19, 1975, at A8, col. 1. The high incidence of asbestos fibers in the air of cities may be traceable to the use of asbestos brake linings in automobiles, and to the use of rock aggregates containing asbestos fibers. The extent of air pollution by asbestos from these sources has not yet been accurately assessed. See EPA Cites Asbestos Hazard: Montgomery Parks Closure Urged, Washington Post, June 8, 1977, at A1, col. 4 & A10, col. 1