Donald M. O'NEALL, Jerry E. Cesaratto, George Weisbarth, Frank W. Potter, Paul L. Bradley, David P. Newlun, Warren E. Henderson, Robert K. Smith, Paul D. Metz, Rollin R. Peterson, Gregory J. Merriman, Joe C. Wilson, Donald G. Farmer, Jay D. Bender, Thomas R. Herman, and Neil C. Lawson, Appellants,

v.

UNITED STATES of America, Caspar W. Weinberger, Secretary of Defense, Department of Defense, Verne Orr, Secretary of Air Force, Department of Air Force, Colonel Yaryan, Base Commander 92d Combat Support Group, Fairchild Air Force Base, Appellees.

Appeal No. 86-591.

United States Court of Appeals, Federal Circuit.

July 31, 1986.

Frank R. Hoover, Woeppel, Hoover & Boyden, Spokane, Wash., argued, for appellants. With him on brief, was Michael J. Beyer.

Howard S. Scher, Dept. of Justice, Washington, D.C., argued, for appellee. With him on brief, were Richard K. Willard, Acting Asst. Atty. Gen., John E. Lamp, U.S. Atty. and John F. Cordes.

Clinton Wolcott, Staff Atty., Nat. Federation of Federal Employees, Washington, D.C., argued for amicus curiae NFFE. With him on brief, was Patrick Riley, Deputy General Counsel.

Sally M. Armstrong, O'Donoghue & O'Donoghue, Washington, D.C., was on brief amicus curiae Metal Trades Dept. of the AFL–CIO.

Before FRIEDMAN, Circuit Judge, BENNETT, Senior Circuit Judge, and NIES, Circuit Judge.

NIES, Circuit Judge.

This appeal involves the entitlement of civilian workers employed at Fairchild Air Force Base, Spokane, Washington, to extra pay because of exposure to asbestos dust in their work. Donald M. O'Neall et al. challenge two rulings of the United States District Court for the Eastern District of Washington, on questions certified by that court under 28 U.S.C. § 1292(b) (1982). In sum, the court held that the Air Force reasonably may limit payment of environmental differential pay to those employees who were exposed to airborne concentrations of asbestos fibers of at least two fibers per cubic centimeter averaged over the workday (2 f/cc standard). The court denominated this level of exposure a "condition precedent" to entitlement. After the court's ruling on the propriety of this standard as the basis for payments, O'Neall et al. moved to place the burden of proof upon the government with respect to proof of the level of exposure. The district court denied the motion. These issues were certified to the Ninth Circuit which accepted the certification. Thereafter, pursuant to the government's suggestion, the Ninth Circuit transferred the appeal to this court. The jurisdiction of the district court was based on 28 U.S.C. § 1346(a)(2); each claimant limited his claim to less the $10,000. The appeal from such cases coming within the exclusive jurisdiction of this court under 28 U.S.C. § 1295(a)(2) and 28 U.S.C. § 1292(b), jurisdiction of the certified questions has been accepted.

### Issues

The following two questions were certified for immediate appeal under 28 U.S.C. § 1292(b) (1982):

1. Did the court correctly rule as a matter of law that as a condition precedent to entitlement to Environmental Differential Pay the plaintiffs are required to establish that they were exposed to airborne concentrations of asbestos fibers of at least 2 fibers/cu. cm.?

2. Did the court correctly rule that the plaintiffs have the burden of establishing exposure to airborne concentrations of asbestos fibers of at least 2 fibers/cu. cm. to entitle them to Environmental Differential Pay?

The parties construe these questions to present the issues of the propriety of the 2 f/cc standard as a threshhold requirement for environmental differential pay and the propriety of requiring the plaintiffs to prove exposure to that level of asbestos dust as part of their prima facie case.

### II.

Donald M. O'Neall and the other plaintiffs in this suit (collectively "Employees") are operators and pipefitters of the central steam plant at Fairchild Air Force Base in Spokane, Washington. As part of their daily duties, these civilian employees perform inspection and maintenance work on or around pipes and boilers covered with asbestos insulation.

On June 17, 1981, Employees filed suit in the United States District Court for the Eastern District of Washington seeking environmental differential pay (EDP) for certain periods since 1970 when such payments were not made. Employees contend that any exposure to asbestos dust as a result of their employment creates an entitlement to EDP. EDP takes the form of an increase in an employee's hourly wages, and, broadly stated, it compensates an employee for exposure to certain types of working conditions of an unusually severe nature. Since June, 1980, the Air Force has implemented the EDP program by making payments only when employees have been exposed to levels of asbestos dust which exceed 2 f/cc, which is the standard adopted by the Air Force for a safe working environment. Employees do not assert here that the Air Force has not paid EDP to them in accordance with that standard.

The statutory basis for Employees' claim of entitlement to EDP is 5 U.S.C. § 5343(c) (1982), which provides, in pertinent part:

(c) The Office of Personnel Management, by regulation, shall prescribe practices and procedures for conducting

wage surveys, analyzing wage survey data, developing and establishing wage schedules and rates, and administering the prevailing rate system. The regulations shall provide—

\*　　\*　　\*　　\*　　\*　　\*

(4) for proper differentials, as determined by the Office, for duty involving unusually severe working conditions or unusually severe hazards.

Pursuant to the predecessor statute, the then Civil Service Commission[1] promulgated Federal Personnel Manual Supplement 532-1, which, at Chapter S8-7(c) provides:

c. *Payment for environmental differential.* An environmental differential is paid to a wage employee who is exposed to a hazard, physical hardship, or working condition of an unusually severe nature listed under the categories in appendix J of this subchapter.

Appendix J contains a list of categories of work for which EDP is authorized, the job situations within each category, and the percentage differential for each category. Category 16, specifically naming asbestos, is relied upon for the period beginning with its March 9, 1975, effective date.[2] That category provides:

16. *Asbestos.* Working in an area where airborne concentrations of asbestos fibers may expose employees to potential illness or injury and protective devices or safety measures have not

practically eliminated the potential for such personal illness or injury.

Obviously, the regulation contains no specified level of average exposure for entitlement to EDP.

The Air Force made no EDP payments for asbestos until 1978. From April, 1978 to June, 1980, Fairfield Air Force Base made EDP payments to Employees for work in the steam plant regardless of degree or frequency of Employees' exposure. Since June, 1980, the Air Force has implemented the EDP regulation with respect to asbestos by making payments thereunder when an employee's actual exposure has been in excess of the two fiber standard.

### III.

The lineage of the 2 f/cc standard may be traced back to determinations made under the Occupational Safety and Health Act (now codified at 29 U.S.C. §§ 651–678 (1982)). The stated purpose of that legislation was "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions." 29 U.S.C. § 651(b). Rather than establishing particular standards regulating exposure to toxic substances, OSHA delegated that task to the Secretary of Labor with the instructions, *inter alia,* that the standards be based upon the best information available[3] and, wherever practicable, expressed in terms of objective criteria.

That the Secretary of Labor fulfilled the foregoing mandate is not in issue in this

---

1. The regulations were written by the Civil Service Commission, which was abolished in 1978. 43 Fed.Reg. 36037 (May 23, 1978). Personnel management functions were transferred to the Office of Personnel Management.

2. For the period November 1, 1970, through March 8, 1975, O'Neall relies upon Category 4 of Appendix J, which allows an 8% differential for certain exposures to toxic chemicals.

    4. *Poisons (toxic chemicals)—high degree hazard.* Working with or in close proximity to poisons (toxic chemicals), ... which involves potential serious personal injury ... including exposure of an unusual degree to toxic chemicals, dust, or fumes of equal toxicity generated in work situations ... wherein protective devices and/or safety measures

have been developed but have not practically eliminated the potential for such personal injury.

In view of our disposition of the case, we need not address this regulation.

3. 29 U.S.C. § 655(b)(5) provides, in part:

    Development of standards under this subsection shall be based upon research, demonstrations, experiments, and such other information as may be appropriate. In addition to the attainment of the highest degree of health and safety protection for the employee, other considerations shall be the latest available scientific data in the field, the feasibility of the standards, and experience gained under this and other health and safety laws.

case. A temporary standard of 8 f/cc was set in 1972. The selection of the current 2 f/cc standard (set in 1974) as the appropriate threshold to satisfy the objectives of OSHA was extensively analyzed and upheld in *Industrial Union Department, AFL–CIO v. Hodgson*, 499 F.2d 467 (D.C. Cir.1974).

While the Air Force is exempted from OSHA standards, 29 U.S.C. § 652(5), it has established a corresponding occupational safety and health program as required by 29 U.S.C. § 668(a).[4] Having considered recommendations from various scientific organizations as to what permissible exposure limit would satisfy the statute, in 1977 the Air Force adopted the same standard as OSHA in Air Force Occupational Safety and Health Standard 161–4 (1977) (AFOSH 161–4).[5] That regulation provides, at subsection (C)(1)(a):

1. Permissible Exposure Limits (PELs):

    a. The maximum 8–hour time-weighted average airborne concentration of asbestos fibers to which any employee may be exposed is 2 fibers/cu cm of air, as determined by the method prescribed in paragraph C2.

As indicated, the Air Force has used that standard as the minimum threshold level for triggering EDP since June, 1980.

It is Employees' position that the only conditions precedent which are permissible in connection with payment of EDP are (1) *any* exposure to asbestos dust, and (2) the fact that the risk of harm due to the exposure has not been practically eliminated. According to Employees, requiring proof of a 2 f/cc threshold of exposure is inconsistent with the plain language of the regulation which allows payment of EDP whenever "airborne concentrations of asbestos fibers *may* expose employees to *potential* illness or injury." Employees argue that there is no medically discernible threshold,

below which exposure would be safe; thus, *any* exposure is compensable under the regulation and it was error to limit EDP payments by the OSHA standard.

Although phrased in various ways, in essence, Employees advance the following arguments in support of their position:

1. The language of the Air Force pay regulations is clear; it was improper for the court to add to or subtract from the plain meaning of the regulation.

2. The OSHA standard was specifically rejected as part of the pay regulation and it is improper to read it back into the regulation.

3. There is significant risk to employees from asbestos dust below the 2 f/cc level. An environment above that level is "illegal" so that no EDP will ever be paid.

4. The government should have the burden of proving that Employees are not entitled to EDP because of its responsibility to provide a safe working environment.

The Air Force counters that:

1. The pay regulations do not provide for EDP merely because of exposure to asbestos dust but only if such exposure is "unusually severe" and the risk has not been "practically eliminated."

2. The Air Force has made a reasonable choice in paying EDP only when the 2 f/cc standard is exceeded because at that point there is a significant risk of harm. "Significant risk of harm" may reasonably be equated with an "unusually severe" hazard.

3. The 2 f/cc standard of OSHA, adopted by the Air Force, is a reasonable standard for protection of workers' health. Employees may not collaterally attack the 2 f/cc standard in these proceedings and, in any event, are asserting

---

**4.** Federal agencies are required under that section, *inter alia,* to "provide safe and healthful places and conditions of employment, consistent with the standards set under section 655 of this title." 29 U.S.C. § 668(a)(1).

**5.** This standard applies to "all Air Force military and civilian personnel" with certain geographical restrictions not applicable here, AFOSH 161–4(A)(1), and represents the minimum requirements "to insure that Air Force workers are *protected from harmful exposures to asbestos.*" AFOSH 161–4(A)(2) (emphasis added).

EDP entitlement unless there is *no* exposure, i.e. the workplace is risk free.

4. Employees seeking EDP entitlement must bear the burden of proof of their claims under ordinary principles of our jurisprudence and no special circumstances are present here which warrant departure from the general rule.

## IV.

Considering first the language of the Air Force EDP regulations, we do not discern therein a clear entitlement to EDP whenever a worker is exposed to asbestos dust. The clarity described by Employees results only by truncating the language of the regulation. Employees emphasize the phrase "may expose employees," and disregard the subsequent limitation, "to potential illness or injury." The latter quoted phrase compels the legal conclusion that the regulation in itself is incomplete. A quantitative level of exposure reasonably related to "potential illness" must be set as a condition precedent to entitlement to EDP.

That the regulation does not set out that level is not unexpected since any level which might be reasonable at one time may have to be changed because of later knowledge or improved safety devices. The regulation provides only general parameters of entitlement. This interpretation is in keeping with the enabling statute which allows "for proper differentials ... [for] *unusually severe* working conditions or *unusually severe* hazards." 5 U.S.C. § 5343(c)(4). Not all hazards give rise to entitlement. The words "unusually severe" appear also in the Federal Personnel Manual Supplement 532–1, Chapter S8–7(c), reproduced *supra,* from which Appendix J depends. With that background, we cannot delete the "potential illness" requirement from the regulation when to do so would not follow the statutory directive. A threshold

must be set at a concentration in excess of which employees may have been exposed to "potential illness or injury," that phrase being construed consistently with the language of § 5343(c)(4).

Contrary to Employees' argument, this case is readily distinguishable from *GAF Corp. v. Occupational Safety and Health Review Commission,* 561 F.2d 913 (D.C. Cir.1977). The *GAF* court interpreted a regulation which required employers to provide certain medical examinations to workers "in an occupation exposed to airborne concentrations of asbestos fibers...." The D.C. Circuit rejected GAF's argument that the word "concentration" implies a quantitative amount and that it need only provide medical examinations if the exposure exceeded a certain level. The Secretary of Labor, charged with administering OSHA, had interpreted the regulation involved in that case to mean *any* exposure, and the D.C. Circuit upheld that interpretation. However, that case is not helpful in construing the present regulations. The phrase construed by the D.C. Circuit simply required exposure, not exposure sufficient to give rise to potential illness or injury.[6]

In response to Employees' argument that the district court improperly added to the regulation, we can only answer that it did not. Rather, the "potential illness" language of category 16 itself requires amplification. Thus, the more substantial inquiry presented under the first certified question is whether the Air Force acted reasonably in setting 2 f/cc as the level of exposure for making EDP payments.[7] We hold that it did.

Employees argue that it was error to "read" the OSHA standard into the EDP regulations. This is so, per Employees, because the OSHA standard was specifically considered and rejected as a basis of

---

6. The Air Force apparently requires annual medical examinations based on .1 f/cc exposure.

7. We pause to note that Employees phrase their arguments as though we are simply reviewing

the *district court's* selection of the 2 f/cc standard, a choice to which allegedly no deference is due. However, it is the Air Force that has adopted the standard, not the district court, and the Air Force's choice is entitled to some weight.

EDP entitlement during the negotiations which led to the regulation involved in this case.[8]

The Federal Prevailing Rate Advisory Committee, which recommended to the Civil Service Commission the language ultimately adopted as the asbestos category in Appendix J, had representatives of both management and labor interests. The labor representatives proposed a draft asbestos category which allowed payment of EDP for work with asbestos or in areas where asbestos work has been done, "until such area is certified as being within the safe limits specified in the OSHA requirements." That proposal was voted down by the Committee in favor of the counter proposal which corresponds to the present category 16. Because of that rejection, Employees assert that the district court erred in reading the OSHA standard back into the EDP regulation.

Employees' argument misconstrues the ruling of the district court. The court did not approve incorporation of the OSHA standard, per se, into the EDP regulations. What the court did was refuse to overturn the agency's choice of 2 f/cc as a reasonable threshold for EDP payments. That the threshold now coincides with the numerical standard in the OSHA regulations does not mean that the OSHA standard has been incorporated into the EDP regulations. On the contrary, the position of management during negotiations indicates that it was unwilling to be tied to the OSHA standard and insisted on retaining its flexibility. It may well be that at some time in the future the agency will adopt an EDP trigger point which differs from the OSHA standard. In any event, we fail to see that the negotiation history is helpful to Employees' position. If anything, it negates their argument that the 2 f/cc standard was unacceptably *high* to labor and that the negotiators intended to adopt an "*any* exposure" standard by the regulation.

■ Employees also argue that it was improper to look to OSHA for guidance in selecting an EDP threshold since the purposes of the two regulatory schemes are materially different. Per Employees, whereas EDP is intended to compensate for risk, the OSHA standard represents a compromise between safety and technical and economic feasibility. Thus, Employees conclude, the OSHA standard cannot satisfy the objectives of the EDP system.

Notwithstanding some differences in the objectives of the two regulatory schemes, the objective of the OSHA system is to ensure "safe and healthful working conditions." 29 U.S.C. § 651(b). One of the considerations taken into account in selecting standards under OSHA is "the attainment of the highest degree of health and safety protection for the employee." 29 U.S.C. § 655(b)(5). Considerations of the same nature governed the agency's selection of the two-fiber standard in AFOSH 161–4. We have not been persuaded that the agency's adoption of 2 f/cc as the EDP threshold is inconsistent with the mandate under the EDP system to compensate for working conditions involving "unusually severe hazards." EDP does not become illusory because exceeding the 2 f/cc level may also trigger other relief. The requirement for compensation above 2 f/cc and the adoption of 2 f/cc as the level not to be exceeded are complementary forms of relief.

■ The district court addressed Employees' arguments with respect to shifting the burden of proof or the burden of production of evidence in detail and we are not persuaded of error. On this point we have considered the cases relied upon by the Employees, none of which require reversal of the district court's ruling. In *United States v. New York, New Haven & Hartford Railroad Co.*, 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247 (1957), the government claimed that it had overpaid the railroad for services in 1944, and the railroad refused a demand for refund. The govern-

**8.** This argument is also made in the *amicus curiae* briefs filed by the Metal Trades Depart- ment of the AFL–CIO and by the National Federation of Federal Employees.

ment thereafter deducted the overpayment from amounts due the railroad in 1950, and the railroad sued for the full amount. The Supreme Court stated the issue as whether "the carrier has the burden of proving the correctness of the 1944 bills, or the Government the burden of proving that it was overcharged," *id.* at 255, 78 S.Ct. at 214, and held that the burden of proof was on the railroad. *Id.* at 262, 78 S.Ct. at 217. That case supports the government's position on this appeal, not the Employees'. In *United States v. Denver and Rio Grande Railroad Co.,* 191 U.S. 84, 24 S.Ct. 33, 48 L.Ed. 106 (1903), the Court simply held that once the United States had presented a *prima facie* case of conversion of logs, the burden shifted to the railroad to prove that it was excused under a statutory exception. *Lykes Bros. Steamship Co. v. United States,* 459 F.2d 1393, 198 Ct.Cl. 312 (1972), involved a suit by a contractor who disputed an excessive profits determination by the Renegotiation Board. After an analysis of the unusual nature of the contractor's suit, the Court of Claims held that once the contractor had produced certain proof within its knowledge, the burden of production shifted to the government, which also bore the ultimate burden of persuasion on what was essentially a claim by the government against the contractor. None of these cases indicate that the Employees here should be relieved of the normal burdens of proof imposed on claimants. This case is more like *Cheeseman v. Office of Personnel Management,* 791 F.2d 138 (Fed.Cir.1986), in which this court upheld the decision of the Merit Systems Protection Board placing the burden of proof upon an applicant for survivor benefits even though the government was not blameless in meeting all of its duties or obligations to its employees.

We reject Employees' argument that payment of EDP during 1978–1980 without utilizing a minimum exposure level raises a "presumption" (within the meaning of Fed.R.Evid. 301) of continued entitlement which the government must overcome. Employees provide no authority for what appears to be a novel theory with respect to creation of a presumption, and we decline to accept it.

In its reply brief, Employees assert that the period of 1970 to 1978 should be treated differently with respect to shifting the burden of production because the government allegedly failed to monitor exposure levels. For this period, Employees propose that its *prima facie* case should consist of a showing of exposure to any asbestos dust and the agency would then be required to produce evidence that appropriate measures had been taken to practically eliminate the risk of harm. It does not appear that this suggestion was made below, at least that is the inference one would make from the district court's statement that "there is no contention that in this case that evidence crucial to the outcome is available only to defendant." Also, the court did not find and was not asked to determine whether or not the government was derelict in not monitoring in the early period. We simply do not know what was required and we decline to take up this issue *de novo*. In any event, we also decline to carve out the 1970–1978 period from our holdings that Employees bear the burden of proof of entitlement to EDP and that simply showing that an employee was exposed to asbestos dust does not make out a *prima facie* case of entitlement.

Finally, this court would hope the United States government would take the lead in protecting workers from hazardous exposures. Courts may be tempted in such circumstances to undertake the task. However, the questions before us are not policy questions but legal ones: what did Congress provide legislatively and did the agency act arbitrarily in implementing the legislative directive. On those narrow issues, we uphold the rulings by the district court.

*Affirmed.*